**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
PB Life and Annuity Co., Ltd., f/k/a Private
Bankers Life and Annuity Co., Ltd.,

                          No. 20-cv-2284 (LJL)

             Plaintiff,

     v.

Universal Life Insurance Company,

             Defendant.
-----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF UNIVERSAL LIFE**
**INSURANCE COMPANY'S MOTION TO COMPEL ARBITRATION**

Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

*Attorneys for Universal Life*
*Insurance Company*

## PRELIMINARY STATEMENT

Defendant Universal Life Insurance Company ("ULICO"), by its attorneys, Clyde & Co US LLP, respectfully submits this memorandum of law in support of its motion for an order compelling arbitration under Section 206 of Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"), 9 U.S.C. § 206, and Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and staying this court action pursuant to Section 3 of the FAA, 9 U.S.C. § 3.

Plaintiff PB Life and Annuity Co., Ltd. f/k/a Private Bankers Life and Annuity Co., Ltd. ("PBLA") commenced this litigation after ULICO had properly demanded arbitration pursuant to a written arbitration agreement in a contract called the Coinsurance Reinsurance Agreement, which ULICO and PBLA entered into on June 30, 2017 ("the Reinsurance Agreement").[1]  The arbitration agreement in the Reinsurance Agreement broadly requires that "*all* disputes or differences between the Parties *arising under or relating to* this Reinsurance Agreement upon which an amicable understanding cannot be reached *shall* be decided by arbitration."  *See* Ex. A § 10.1(a), at 20 (emphasis added).

Section 4.2 of the Reinsurance Agreement requires PBLA to deposit and maintain in a trust account – for "the sole use and benefit of ULICO" – cash-equivalent assets which conform in kind and amount with the terms of the Reinsurance Agreement and governing Puerto Rican law.  ULICO contends that, at the direction of PBLA's controlling owner, Greg Lindberg (who, in March 2020, was convicted of felony bribery and wire fraud charges), PBLA unlawfully replaced the cash-equivalent assets in the trust account with loans and debt obligations (the

---

[1] A true and correct copy of the Reinsurance Agreement is attached as Exhibit A to the April 21, 2020 Affirmation of Michael A. Knoerzer.  All other exhibits referenced herein are attached to the Knoerzer Affirmation.

"IOUs") from other companies owned and controlled by Lindberg. ULICO further contends that these IOUs do not conform to the requirements set forth in the Reinsurance Agreement for such funds. ULICO estimates that PBLA's compliant collateral is materially deficient from the amount required to fulfill PBLA's collateral obligations under the Reinsurance Agreement.

On January 27, 2020, ULICO commenced arbitration against PBLA concerning PBLA's breach of its obligations under, *inter alia*, Section 4.2 of the Reinsurance Agreement. PBLA denied being in default of its obligations and, for this reason, declined to arbitrate. However, rather than proceed to arbitration as it contractually agreed to do, PBLA commenced this court action against ULICO, declaring that because the collateral is to be held in a trust account established pursuant to a trust agreement, and because that trust agreement does not contain an arbitration clause, the parties' dispute must be litigated and not arbitrated.

PBLA's position is ill-conceived. The Reinsurance Agreement not only contains a requirement that PBLA post collateral in a defined amount and comprising a defined type of assets, but it also contains an arbitration agreement which requires arbitration of all disputes or differences between the parties "*arising under or relating to* this Reinsurance Agreement." That a separate trust agreement not containing an arbitration clause was established by the Reinsurance Agreement does not vitiate the parties' agreement to arbitrate "all disputes or differences between the parties arising under or relating to this Reinsurance Agreement." Moreover, the arbitration agreement calls for the arbitration to be governed by the Commercial Arbitration Rules of the American Arbitration Association, which expressly state that it is for the arbitrators to decide the arbitrability of any issue between the parties.

Accordingly, ULICO seeks an order under Section 206 of the Convention and Section 4 of the FAA compelling arbitration pursuant to the Reinsurance Agreement, and staying this action pursuant to Section 3 of the FAA, pending the outcome of the arbitration.

## STATEMENT OF FACTS

### A.   The Parties

ULICO is a stock life insurance company licensed and domiciled in Puerto Rico.[2] Among the business written by ULICO is annuity insurance for private individuals.  *Id.*  PBLA is a life reinsurance company licensed and domiciled in Bermuda.  *Id.*  PBLA is one of a number of insurance companies and commercial businesses ultimately owned by a single individual: Greg E. Lindberg.  *Id.*

### B.   The Nature of Reinsurance

Reinsurance is a contractual relationship which has been described by the Second Circuit Court of Appeals as follows:

> Primary insurers reinsure to diversify risk.  The mechanics of reinsurance can be simply described.  One insurer (a "ceding insurer") "cedes" all or part of the risk relating to a policy, or a group of policies, to a reinsurer.  A portion of risk not "ceded" is "retained."  The reinsurer indemnifies the ceding insurer for any liability incurred that is covered by the reinsurance.  The relationship created is strictly one of indemnification.  The reinsurer has no privity with, and is generally not liable to, the original purchaser of the underlying policy.

*Travelers Indem. Co. v. Scor Reins. Co.*, 62 F.3d 74, 76 (2d Cir. 1995).

Because the reinsurer is ordinarily not in privity with the original purchaser of the underlying policy, the ceding insurer is in the position of having on the one hand issued policies for which it alone is liable, but having on the other had shared a substantial amount of its premium with the reinsurer.  This combination of retained liability but departed premium can sometimes cause an insurer to be subject to credit rating downgrades unless it can take "credit for

---

[2] Knoerzer Aff. ¶ 3.

reinsurance."[3]  Depending upon the domicile of the reinsurer, it is sometimes necessary for a reinsurer to post collateral for its obligations so that the ceding insurer can take "credit for reinsurance."

## C.    The Reinsurance Agreement Between ULICO and PBLA

On June 30, 2017, ULICO and PBLA entered into the Reinsurance Agreement as "the exclusive reinsurance arrangement for newly issued fixed annuity business sold in Puerto Rico for both PBLA and ULICO."  *See* Ex. A § 2.1(c).  Under the Reinsurance Agreement, ULICO agreed to cede to PBLA, and PBLA agreed to reinsure, between 75% and 100% of ULICO's obligations under certain insurance policies or annuity contracts written by ULICO, with the percentage of reinsurance depending upon the particular type of policy sold.  *Id.* § 2.1(a)-(b).

Article IV, entitled "Credit for Reinsurance and Related Matters," describes PBLA's agreement to ensure that ULICO will be able to take credit for PBLA's reinsurance of ULICO:

> PBLA shall take such steps as may be required for ULICO to receive full credit on ULICO's statutory financial statements for the reinsurance ceded under this Reinsurance Agreement.  To that end, as of the Closing Date and at all times during the term of this Reinsurance Agreement, PBLA shall enter into the Reinsurance Trust Agreement and Comfort Trust Agreement as required by Section 4.2, and comply with all terms therein.[4]

Section 4.2 of the Reinsurance Agreement provides further detail regarding the nature and amount of collateral that PBLA is required to deposit and maintain in the Reinsurance Trust Account:

> PBLA shall establish in accordance with the Reinsurance Trust Agreement and Comfort Trust Agreement, respectively, the Reinsurance Trust Account and the

---

[3] The International Risk Management Institute, Inc. ("IRMI") defines "Credit for Reinsurance" as "a statutory accounting procedure permitting a ceding company to treat amounts due from reinsurers as assets or reductions from liability based on the status of the reinsurer."  *See Credit for Reinsurance*, IRMI, https://www.irmi.com/term/insurance-definitions/credit-for-reinsurance.
[4] *See* Ex. A § 4.1 ("Reserves").

Comfort Trust Account[5] each with an independent financial institution reasonably acceptable to ULICO for the sole use and benefit of ULICO, for so long as there are Insurance Policies reinsured under this Reinsurance Agreement. Collateral with an aggregate Fair Market Value equal to one hundred two (102%) of Statutory Reserves will be held within the Reinsurance Trust Account in accordance with Article 11 of Rule 98 of the Insurance Code of Puerto Rico. Excess collateral with an aggregate Book Value equal to three percent (3%) of the Statutory Reserves will be held in the Comfort Trust Account for the benefit of ULICO provided that such excess collateral shall increase to an aggregate Book Value equal to five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.[6]

The Reinsurance Agreement contains the following arbitration clause:

(a) Except as otherwise provided in this Reinsurance Agreement, all disputes or differences between the Parties arising under or relating to this Reinsurance Agreement upon which an amicable understanding cannot be reached shall be decided by arbitration pursuant to the terms of this Section. Except as otherwise provided in this Reinsurance Agreement, the arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

(b) The court of arbitrators shall consist of three (3) arbitrators who must be officers or retired officers of life insurance or reinsurance companies (other than the Parties to this Reinsurance Agreement or their Affiliates). Each arbitration under this Reinsurance Agreement shall be held in Puerto Rico, unless a different location is mutually agreed upon by the Parties.

(c) Within thirty (30) calendar days of written demand of any Party to arbitrate any dispute, ULICO and PBLA shall each appoint an arbitrator and notify the other Party of the name and address of their arbitrator. The two (2) arbitrators so appointed shall thereupon select a third (3rd) arbitrator. If either Party shall fail to appoint an arbitrator as herein provided, or should the two (2) arbitrators so named fail to select a third (3rd) arbitrator within thirty (30) calendar days of their appointment, then in either event, either Party may request the American Arbitration Association to appoint the third (3rd) arbitrator. The three (3) arbitrators so selected shall constitute the court of arbitrators.

(d) A decision of a majority of said court of arbitrators shall be final and binding and there shall be no appeal therefrom. The court shall not be bound by legal rules of procedure and may receive evidence in such a way as to do justice

---

[5] The "Comfort Trust" is defined in the Reinsurance Agreement as a trust account established by PBLA for the benefit of ULICO to secure PBLA's obligations to ULICO with respect to PBLA's obligations under the Reinsurance Agreement with respect to any over-collateralization. *Id.* at 4.
[6] *Id.* § 4.2(a).

between the Parties.  The court shall enter an award which shall do justice between the Parties and the award shall be supported by written opinion.

(e) The cost of arbitration, including the fees of the arbitrators, shall be borne equally by the Parties unless the court of arbitrators shall decide otherwise.

Ex. A § 10.1.  The Reinsurance Agreement also contains the following relevant provisions:

> **Section 10.6   Entire Agreement:** This Reinsurance Agreement, the Reinsurance Trust Agreement and Comfort Trust Agreement supersede all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes (along with the exhibits, schedules and other documents delivered pursuant to this Reinsurance Agreement, the Reinsurance Trust and Comfort Trust Agreement) a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. This Reinsurance Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Reinsurance Agreement executed by the Parties.

> **Section 10.7   Governing Law:** This Reinsurance Agreement shall be construed in accordance with the laws of the Commonwealth of Puerto Rico without giving effect to the principles of conflicts of law thereof.

> **Section 10.8   Interpretations:** No uncertainty or ambiguity in this Reinsurance Agreement shall be construed or resolved against any Party whether under any rule of construction or otherwise.  No Party to this Reinsurance Agreement shall be considered the draftsman. The Parties acknowledge and agree this Reinsurance Agreement has been negotiated, reviewed and accepted by all Parties and their attorneys and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all Parties hereto.

Ex. A, §§ 10.6, 10.7, 10.8, at 22.

## D.   PBLA Replaces its Collateral with Inter-Company IOUs

At all times relevant, PBLA was owned by a holding company known as Eli Global, which in turn was controlled by Greg Lindberg.  As reported by the Wall Street Journal in an article from early 2019:

> Soon after Greg Lindberg moved into the insurance business, the North Carolina entrepreneur went on a spending spree.

> He bought nearly 100 companies around the globe, an estate in the Florida Keys, an Idaho lakeside retreat, a Gulfstream jet, and the most expensive mansion ever sold in Raleigh, N.C.  In September 2018 he added a 214-foot yacht with room for

a dozen overnight guests.  He also became the largest political donor in North Carolina and lavished money on other races around the country.

The cash came, at least in part, from huge sums Mr. Lindberg diverted from the group of life insurance firms he began assembling in 2014, a Wall Street Journal investigation found.

The Yale-educated executive lent at least $2 billion from those insurers to scores of entities he controlled, using much of it to expand his private holdings, according to interview, regulatory filings and more than 4,500 internal documents from Mr. Lindberg's companies reviewed by the Journal.[7]

On March 18, 2019, Greg Lindberg and others associated with Eli Global were indicted by a federal grand jury for financial crimes including wire fraud and bribery.  On March 5, 2020, a jury found Lindberg guilty of conspiracy to commit honest services wire fraud and bribery.[8]

**E.      ULICO is Among Lindberg's Victims**

Pursuant to the terms of the Reinsurance Agreement, PBLA is required to maintain collateral of "Qualifying Trust Assets" (*see* Ex. A at 6) which comply with Article 11 of Rule 98 of the Insurance Code of Puerto Rico.  Ex. A §§ 4.2, 4.3.  Article 11 of Rule 98 provides in part:

> Assets deposited in the trust account shall be valued according to their current fair market value and shall consist only of cash in United States dollars, certificates of deposit issued by a United States or Puerto Rico bank and payable in United States dollars, and investments permitted by the Insurance Code or any combination of the above, ***provided investments in or issued by an entity controlling, controlled by or under common control with either the grantor or the beneficiary of the trust shall not exceed ten percent (10%) of total investments***. The reinsurance agreement may further specify the types of investments to be deposited.[9]

ULICO contends (and seeks to establish in the arbitration) that PBLA withdrew a substantial amount of "Qualifying Trust Assets" and replaced them with non-conforming IOUs

---

[7] Maremont & Scism, *Financier Who Amassed Insurance Firms Diverted $2 Billion Into His Private Empire*, The Wall Street Journal (Feb. 28, 2019), https://www.wsj.com/articles/financier-who-amassed-insurance-firms-diverted-2-billion-into-his-private-empire-11551367856.

[8] Scism & Maremont, *Insurance Magnate Greg Lindberg Found Guilty on Bribery Charges*, The Wall Street Journal (Mar. 5, 2020), https://www.wsj.com/articles/insurance-magnate-greg-lindberg-found-guilty-on-bribery-charges-11583426452.

[9] *See* Ex. B, Rule 98 (titled "Credit for Reinsurance"), at Art. 11(D)(1)(b).

from other companies owned and controlled by Lindberg.  What market value these IOUs

possess, if any, remains to be proven, but ULICO contends (and seeks to establish in the

arbitration) that these IOUs are not Qualifying Trust Assets as defined in the Reinsurance

Agreement and do not comply with Rule 98 of the Insurance Code of Puerto Rico.  ULICO seeks

to establish in the arbitration that it is has been and continues to be materially damaged by

PBLA's withdrawal of Qualifying Trust Assets from the Reinsurance Trust Account and that

PBLA must be required to post sufficient Qualifying Trust Assets to bring PBLA into

compliance with its obligations under the Reinsurance Agreement and governing Puerto Rican

law.

**F.     ULICO's Demand for Arbitration Under the Reinsurance Agreement**

On January 16, 2020, ULICO sent a "Cure Letter" giving PBLA notice that it was in

breach of the Reinsurance Agreement and demanding that it cure the breach:

> Notice is hereby given that ***PBLA is not currently in compliance with the requirements of the Reinsurance Agreement*** relating to the percentage of Qualifying Trust Assets which may be comprised of the corporate debt of entities affiliated with PBLA (the "Breach").   Section 4.2(a) of the Reinsurance Agreement requires, in relevant part, that "collateral with an aggregate Fair Market Value equal to one hundred and two percent (102%) of Statutory Reserves will be held within the Reinsurance Trust Account in accordance with Article 11 of Rule 98 of the Insurance Code of Puerto Rico."  Article 11(D)(1)(b) of Rule 98 requires that "investments in or issued by an entity controlling, controlled by or under common control with either the granter or the beneficiary of the [Reinsurance Trust Account] shall not exceed ten percent (10%) of total investments."  ***As of this date, over sixty five percent (65%) of the assets held in the Reinsurance Trust Account are loan obligations of PBLA's affiliated entities.    Therefore, PBLA is in violation of both Section 4.2(a) of the Reinsurance Agreement and also in breach of Rule 98 of the Insurance Code of Puerto Rico.***

*See* ECF No. 1-7 (emphasis added) (footnote omitted).  The Cure Letter demanded that PBLA

immediately cure its breach of the Reinsurance Agreement and warned PBLA that absent a

satisfactory response, ULICO would commence arbitration.  *Id.*  PBLA responded on January

24, 2020, declaring that "PBLA denies that it has breached or violated Section 4.2(a) of the Reinsurance Agreement or Rule 98 of the Insurance Code of Puerto Rico."  *See* Ex. C.

On January 27, 2020, ULICO demanded arbitration against PBLA under Section 10.1 of the Reinsurance Agreement.  *See* Ex. D (the "Demand").  In its Demand, ULICO stated that, given PBLA's refusal to cure its breach, ULICO "will seek relief for PBLA's failure to comply with Section 4.2 of the Reinsurance Agreement" through arbitration.  *Id.* at 1.  The Demand pointed to relevant provisions in the Reinsurance Agreement's arbitration clause, including the parties' agreement in Section 10.1(a) to arbitrate under the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and the requirement of Section 10.1(c) that PBLA appoint its arbitrator within 30 days of ULICO's Demand, failing which, ULICO has the right to request that the AAA appoint an arbitrator on PBLA's behalf.  *Id.* at 1-2.

On February 25, 2020, counsel for PBLA responded to the Demand that "PBLA denies any breach [of the Reinsurance Agreement] and rejects ULICO's demand for arbitration."  *See* Ex. E at 1.  In this letter, PBLA denied the existence of a dispute "arising under or relating to" the Reinsurance Agreement.  *Id.* (quoting Ex. A § 10.1).  Instead, PBLA argued that ULICO's claim arises from the Reinsurance Trust Agreement.  *Id.* at 1-2.

## G.     Appointment of the Arbitration Panel

On February 24, 2020, ULICO notified PBLA of its appointment of Mr. David Thirkill as arbitrator.  *See* Ex. F.  PBLA did not appoint an arbitrator within 30 days of ULICO's Demand, as was required by Section 10.1(c) of the Reinsurance Agreement.  Consistent with the governing rules of the American Arbitration Association, ULICO, on March 4, 2020, submitted a request to the AAA to appoint an arbitrator on PBLA's behalf.  *See* Ex. G.  On March 10, 2020 the AAA confirmed receipt of ULICO's request under the Reinsurance Agreement.  *See* Ex. H.

PBLA responded *ex parte* to the AAA's March 10 letter on March 13, 2020,[10] stating that "PBLA does not consent to arbitration or to AAA/ICDR taking any action in this matter, including appointing an arbitrator." *See* Ex. I at 1.  Also in this letter, PBLA argued that any dispute must be litigated pursuant to Section 6.5(a) of the Reinsurance Trust Agreement, which superseded the Reinsurance Agreement. *Id.*  The AAA provided ULICO with a copy of PBLA's letter and responded to PBLA's refusal to arbitrate by noting that the governing AAA Commercial Arbitration Rules ("AAA Rules")[11] require that any challenges to arbitral jurisdiction be decided by the Arbitral Tribunal once it is fully empaneled. *See* Ex. J.

After first appointing for PBLA an arbitrator candidate who did not meet the requirement in the Reinsurance Agreement that the arbitrators "must be officers or retired officers of life insurance or reinsurance companies," *see* Ex. A § 10.1(b), the AAA subsequently appointed Daniel E. Schmidt, IV, as PBLA's arbitrator, *see* Ex. L.  Mr. Schmidt is a veteran of several hundred insurance and reinsurance arbitrations and is a retired officer of a life insurance company who therefore easily meets the requirements of the Reinsurance Agreement.[12]  Mr. Schmidt followed the AAA Rules and made disclosures of his prior contacts with the parties. Neither ULICO nor PBLA have raised objections to Mr. Schmidt's qualifications or his conflict disclosures.  Mr. Schmidt and Mr. Thirkill were therefore obliged under the Reinsurance Agreement which forms the basis of their appointment to select a third arbitrator (the umpire) by no later than May 6, 2020. *See* Ex. A § 10.1(c).

On April 21, 2020, Mr. Schmidt and Mr. Thirkill sent an email to ULICO and PBLA declaring that they had selected a third arbitrator, Mr. Klaus H. Kunze, and therefore "a court of

---

[10] PBLA filed its Complaint in the present action on the same day, although PBLA did not give notice of that filing to ULICO or its counsel until three weeks later.
[11] *See* Ex. K.
[12] *See* Mr. Schmidt's biography at https://www.arias-us.org/profile/?id=10057.

arbitrators has been formed pursuant to Section 10.1" of the Reinsurance Agreement.  *See* Ex. M.[13]

## ARGUMENT

### THE PARTIES' DISPUTE IS SUBJECT TO MANDATORY ARBITRATION AND THEREFORE ARBITRATION SHOULD BE COMPELLED AND THE LITIGATION STAYED

**I.     Governing Law**

This motion is founded upon the first two chapters of Title 9 of the United States Code: Chapter One, 9 U.S.C. §§ 1-16 (the "Federal Arbitration Act" or "FAA") and Chapter Two, 9 U.S.C. §§ 201-08, which implements the provisions of the New York Convention.[14]  As explained below, the New York Convention applies to this action because it involves a commercial contract between a domestic and a foreign entity.  However, the general provisions in Chapter One of the FAA also apply to the extent they do not conflict with the New York Convention.  *See* 9 U.S.C. § 208; *Int'l Eng'g & Constr. S.A. v. Baker Hughes*, 399 F. Supp. 3d 194, 199 (S.D.N.Y. 2019).

**A.     The New York Convention**

The New York Convention "is an international treaty mandating that courts in signatory states 'shall, at the request of one of the parties [to an arbitration agreement], refer the parties to arbitration.'"  *In re MF Glob. Holdings Ltd.*, 569 B.R. 544, 551 (Bankr. S.D.N.Y. 2017) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 527 (1974).  Therefore, it applies to arbitration proceedings that arise out of commercial legal relationships where at least one foreign party is

---

[13] While the arbitration proceedings are confidential, Exhibit M relates not to the proceedings, but the fact that the "court of arbitrators" has in fact been constituted in accordance with the Reinsurance Agreement.

[14] Unlike the FAA, which does not, by itself, confer subject matter jurisdiction, the Convention expressly conveys original jurisdiction to district courts over proceedings falling under the Convention.  *See* 9 U.S.C. § 203.

involved.  *See* 9 U.S.C. § 202.  The Convention applies to this matter because PBLA, which is domiciled in Bermuda, is a party to the Reinsurance Agreement.[15]

"The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520.  Thus, the strong federal policy that favors arbitration of disputes applies with equal force to international transactions.  *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (The New York Convention reinforces "the emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce.").

Section 206 of the Convention provides that a "court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."  9 U.S.C. § 206.  The "threshold question [under Section 206] is whether a valid agreement to arbitrate exists in the context of an international commercial agreement." *Baker Hughes*, 399 F. Supp. 3d at 199 (alteration in original).  An agreement to arbitrate exists within the meaning of the Convention if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the Convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope.  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001); *see also* 9 U.S.C. § 202.  "Upon finding that such an agreement exists, a

---

[15] *See, e.g.*, *Liberty Re (Bermuda) Ltd. v. Transam. Occidental Life Ins. Co.*, No. 04 CIV. 5044 (NRB), 2005 WL 1216292, at *2 (S.D.N.Y. May 23, 2005) ("the New York Convention applies . . . as Liberty Re is a Bermuda corporation, Transamerica is an Iowa corporation, and the parties are seeking enforcement in New York").

federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement." *U.S. Titan*, 241 F.3d at 146.[16]

### B.    The General Provisions of the Federal Arbitration Act

The general provisions in Chapter One of the FAA apply to any arbitration agreement involving interstate and/or international commerce, including commerce involving U.S. Territories. *See* 9 U.S.C. § 1; *see also David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 249 (2d Cir. 1991) (noting that the Supreme Court held in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967), that the FAA "applies in federal court to diversity suits which relate to contracts involving interstate or international commerce")).  The Reinsurance Agreement is within the scope of those provisions because it is a commercial contract between a Bermuda insurance company (PBLA) and a Puerto Rican insurance company (ULICO) to reinsure insurance policies issued in Puerto Rico.  *See* Ex. A § 2.1(b)-(c).

Section 4 of the FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  Under this section, if a court determines that there is a valid written arbitration agreement and one party has refused to arbitrate under it, the court "*shall* make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  *Id.* (emphasis added).  Section 3 of the FAA requires courts to stay litigation when the parties' claims have been referred to arbitration.  *See* 9 U.S.C. § 3.  A

---

[16] Section 206 grants courts broader authority than FAA § 4, which permits federal courts to compel arbitration only in the district in which they sit.  In an international dispute under the Convention, Section 206 permits a court to compel parties to arbitrate in any place provided for in the parties' written arbitration agreement.  *See Oil Basins Ltd. v. Broken Hill Proprietary Co.*, 613 F. Supp. 483, 486 (S.D.N.Y. 1985).

mandatory stay of court proceedings comports with the FAA's "statutory scheme and pro-arbitration policy."[17]

## II.    Standard of Review

When considering a motion to compel arbitration, district courts in the Second Circuit apply the standard applied to a motion for summary judgment.  *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Syncora Guar. Inc. v. HSBC Mexico, S.A.*, 861 F. Supp. 2d 252, 258 (S.D.N.Y. 2012).  Courts will grant summary judgment if the record shows that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c).  Therefore, an order compelling arbitration will be appropriate if there is no genuine issue as to any material fact regarding the arbitrability of the dispute.  *See, e.g.*, *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013).  When the moving party has documented particular facts in the record, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" in order to defeat a motion to compel arbitration. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006).  Whether the opposing party believes the "dispute to be arbitrable is irrelevant to the arbitrability" of the claims.  *See Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machs., Local Union No. 550, Int'l Bhd. of Teamsters*, 167 F.3d 764, 769 (2d Cir. 1999).

The United States Court of Appeals for the Second Circuit follows a two-part test to determine the arbitrability of claims: (1) whether the parties have entered into a valid agreement to arbitrate and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement.  *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir.

---

[17] *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("The plain language [of 9 U.S.C. § 3] specifies that the court 'shall' stay proceedings pending arbitration, provided an application is made and certain conditions are met.  It is axiomatic that the mandatory term 'shall' typically 'creates an obligation impervious to judicial discretion.'") (internal citations, footnote omitted).

2002).  However, it is widely recognized that "the parties themselves may provide that the arbitrator, not the court, shall determine whether an issue is arbitrable."  *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996); *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (parties may agree to arbitrate arbitrability).  As such, where the parties' contract evidences their intent to submit questions of arbitrability to the arbitrators, the court need not reach part two of this two-part test.

## III.    There is a Valid Arbitration Agreement Which Embraces the Parties' Dispute.

### A.    There is a Valid Arbitration Agreement.

The Reinsurance Agreement, which was negotiated between two sophisticated parties engaged in a commercial relationship involving hundreds of millions of dollars, contains an unambiguous written arbitration agreement providing that any dispute "arising under or relating to" the Reinsurance Agreement "shall be decided by arbitration."  Ex. A § 10.1(a).  PBLA does not dispute the validity and enforceability of the Reinsurance Agreement or the arbitration clause within it.  Indeed, PBLA alleges in the Complaint that the Reinsurance Agreement contains a binding arbitration clause.  *See* Compl. ¶ 10, ECF No. 1.  Therefore, ULICO respectfully submits that the Court may take it as agreed that a valid arbitration agreement exists between the parties.

### B.    The Governing AAA Rules Require the Question of Arbitrability to be Submitted to the Arbitrators.

Under the FAA, there is a general presumption that the issue of arbitrability should be resolved by the courts.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995).  However, the issue of arbitrability may be referred to the arbitrator if "there is clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator."  *Bell v. Cedant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks omitted); *PaineWebber*, 81 F.3d at 1198 ("the

parties themselves may provide that the arbitrator, not the court, shall determine whether an issue is arbitrable").

PBLA and ULICO agreed in the Reinsurance Agreement that any arbitration should be governed by the AAA Rules.  *See* Ex. A § 10.1(a).  Rule 7 of the AAA Rules provides that the arbitrators "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to ***the arbitrability of any claim*** or counterclaim."  *See* Ex. K at R-7(a) (emphasis added).  By agreeing that disputes arising under the Reinsurance Agreement are governed by the AAA Rules, PBLA agreed to submit all questions of arbitrability to the arbitrators.  Courts in this Circuit have consistently held that incorporating the AAA Rules into the parties' arbitration agreement constitutes "clear and unmistakable evidence" of their intent to submit questions of arbitrability to the arbitrators. *See, e.g.*, *Baker Hughes*, 399 F. Supp. 3d at 201 ("An arbitration clause that incorporates the AAA's rules 'that empower an arbitrator to decide issues of arbitrability . . . serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'") (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (when "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator"); *JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 167 F. App'x 266, 268 (2d Cir. 2006) ("The intent of the parties to commit the question of arbitrability to the arbitrator is further demonstrated by the incorporation of the rules of the American Arbitration Association ("AAA") that empower the arbitrator to determine issues of arbitrability.").

For the reasons stated above, ULICO respectfully requests that the Court compel arbitration of the parties' dispute in accordance with the valid arbitration agreement in

Reinsurance Agreement between ULICO and PBLA.

### C. The Broad Arbitration Clause in the Reinsurance Agreement Unambiguously Encompasses This Dispute.

Even in the absence of Rule 7 of the AAA Commercial Rules, it would be beyond doubt that the dispute raised by ULICO is arbitrable under the Reinsurance Agreement.  The federal policy favoring arbitration is well-established and requires courts "to construe arbitration clauses as broadly as possible."  *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal quotation marks omitted).  Any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration")).  Therefore, an order compelling arbitration must be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *See AT & T Techs.*, 475 U.S. at 650.

The Reinsurance Agreement's arbitration clause contains sweeping language that encompasses "*all* disputes or differences between the Parties *arising under or relating to* this Reinsurance Agreement."  Ex. A § 10.1 (emphasis added).

Courts have consistently held that an agreement to arbitrate "[a]ny claim or controversy arising out of or relating to" the parties' contract is the "paradigm" broad arbitration clause. *Collins & Aikman*, 58 F.3d at 20; *In re MF Glob. Holdings*, 571 B.R. at 92 (provision requiring arbitration of "any and all disputes arising under or relating to" insurance policy is "plainly broad"); *Leber v. Citigroup, Inc.*, No. 07-CV-9329 (SHS), 2019 WL 1331313, at *2 (S.D.N.Y. Mar. 25, 2019) ("any dispute arising under or relating to the terms of this Agreement" is classically broad arbitration language); *see also Ferrari N. Am., Inc. v. Ogner Motor Cars, Inc.*,

No. 02 CIV.7720 SAS, 2003 WL 102839, at *3 (S.D.N.Y. Jan. 9, 2003) ("An arbitration clause is broad if the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause.") (internal quotation marks omitted).

The "existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (quotation and citation omitted).  The arbitration agreement found at Section 10.1 of the Reinsurance Agreement – which refers to arbitration "*all*" disputes "*arising under or relating to*" the Reinsurance Agreement – is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability."  Ex. A § 10.1(a) (emphasis added); *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000) ("any controversy or claim between [the parties] arising out of or relating to" the Agreement is "indisputably broad").

ULICO's Demand for arbitration articulates a dispute as to whether PBLA is in compliance with its obligations under Article 4 of the Reinsurance Agreement, entitled "Credit for Reinsurance and Other Matters."  *See* Ex. D.  While Article 4 calls for the establishment of a Reinsurance Trust Account, and the execution of a Reinsurance Trust Agreement, Section 4.2 of the Reinsurance Agreement requires PBLA to post collateral in that Reinsurance Trust Account equal to 102% of its Statutory Reserves in a form and manner consistent with the Insurance Code of Puerto Rico.  Section 4.3 of the Reinsurance Agreement requires that the collateral constitute "Qualifying Trust Assets," as that term is defined in the Reinsurance Agreement.  ULICO's contention is that PBLA has breached all of Article 4, but in particular, these two sections.

PBLA does not dispute that a justiciable controversy exists between PBLA and ULICO, and it even concedes that Section 4.2 of the Reinsurance Agreement contains "specific requirements for the collateral and assets to be deposited into the Reinsurance Trust Account." *See* Compl. ¶¶ 9, 26, ECF No. 1.  It is plain, therefore, that ULICO's dispute with PBLA is one which is "arising under or relating to" the Reinsurance Agreement and therefore falls within the scope of the arbitration agreement found at Section 10.1.

The only defense to arbitration that PBLA has identified thus far is that the "Entire Agreement" clause in the Reinsurance Trust Agreement should be read to mean that the arbitration clause in the Reinsurance Agreement is unenforceable in actions under the Reinsurance Trust Agreement.  *See* Compl. ¶¶ 14, 20, ECF No. 1.  But ULICO's dispute is not under the Reinsurance Trust Agreement – it is under the Reinsurance Agreement, which itself contains specific and binding provisions regarding the Qualifying Trust Assets which PBLA must post as collateral.  PBLA's overbroad interpretation of the Entire Agreement clause in the Reinsurance Trust Agreement would void not only the arbitration agreement in the Reinsurance Agreement, but the Reinsurance Agreement itself (a result which is contrary to PBLA's own arguments).

Notably, the Reinsurance Agreement contains an even broader "Entire Agreement" clause than is found in the Reinsurance Trust Agreement.  The Reinsurance Agreement's Entire Agreement clause incorporates the Reinsurance Trust Agreement and restricts the manner in which the terms of the Reinsurance Agreement can be modified:

> This Reinsurance Agreement, the Reinsurance Trust Agreement and Comfort Trust Agreement supersede all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes (along with the exhibits, schedules and other documents delivered pursuant to this Reinsurance Agreement, the Reinsurance Trust and Comfort Trust Agreement) a complete and exclusive statement of the terms of the agreement between the Parties with respect

to its subject matter.   This Reinsurance Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Reinsurance Agreement executed by the Parties.

Ex. A § 10.6.  Given that the parties have declared that the Reinsurance Agreement may not be amended, supplemented, or modified by any agreement except a written agreement that identifies itself as an amendment to the Reinsurance Agreement, and given further that no such amendment has been undertaken by the parties, PBLA's argument that the Reinsurance Trust Agreement nullifies the arbitration clause in the Reinsurance Agreement must fail.

Certainly, if ULICO and PBLA had intended to arbitrate all disputes arising from the Reinsurance Agreement except those relating to the Reinsurance Trust Account, they would have said so clearly in the contract itself.

## **CONCLUSION**

For these reasons, ULICO respectfully requests that the Court issue an order compelling arbitration pursuant to 9 U.S.C. §§ 4 and 206, and staying the litigation pending the outcome of the arbitration pursuant to 9 U.S.C. § 3.

Dated:   New York, New York
              April 21, 2020

Respectfully submitted,

CLYDE & CO US LLP

By: _____
      Michael A. Knoerzer
      Jeffrey C. Fegan
      Kyley Knoerzer
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
T: (212) 710-3900

*Attorneys for Universal Life
Insurance Company*