UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/12/2020
```

------------------------------------------------------------------X
:
PB LIFE AND ANNUITY CO. LTD.,                                    :
:
Plaintiff,          :
:                    20-cv-2284 (LJL)
-v-                                :
:                    OPINION & ORDER
UNIVERSAL LIFE INSURANCE COMPANY,                               :
:
Defendant.           :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Universal Life Insurance Company ("ULICO") moves to compel arbitration

pursuant to Section 206 of the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards (the "New York Convention"), 9 U.S.C. § 206, and Section 4 of the Federal

Arbitration Act ("FAA"), 9 U.S.C. § 4. Dkt. No. 14. Plaintiff PB Life and Annuity Co. Ltd.

("PBLA") opposes this motion and simultaneously moves for a permanent injunction enjoining

ULICO from proceeding with arbitration. Dkt No. 19.

For the reasons discussed below, ULICO's motion to compel arbitration is granted and

PBLA's motion for a permanent injunction is denied. This action is stayed pursuant to 9 U.S.C.

§ 3.

## BACKGROUND

### A.    The Agreements

PBLA is an insurance company organized under the laws of Bermuda with its principal

place of business in Bermuda. Dkt. No. 5 ¶ 2. ULICO is an insurance company organized under

the laws of Puerto Rico with its principal place of business in Puerto Rico. *Id.* ¶ 2. At issue are

two agreements between the parties—one agreement exclusively between PBLA and ULICO,

and a second agreement between PBLA, ULICO, and a third party.  Both parties agree that the

agreements are unambiguous.  Dkt. No. 29-1 at 25:11-12.

1.      **Reinsurance Agreement**

On or about June 30, 2017, PBLA and ULICO executed a Coinsurance Reinsurance

Agreement ("Reinsurance Agreement") whereby PBLA agreed to reinsure liabilities with respect

to certain insurance policies issued by ULICO.  Under the Reinsurance Agreement, ULICO

agreed to cede to PBLA and PBLA agreed to reinsure between 75% and 100% of ULICO's

obligations under certain insurance policies or annuity contracts written by ULICO, with the

percentage of reinsurance depending upon the particular type of policy sold.

Section 4.1 ("Reserves") of Article IV ("Credit for Reinsurance and Related Matters") of

the Reinsurance Agreement provides that:

> ULICO and PBLA shall establish and maintain proper reserves for the Insurance
> Policies in accordance with statutory accounting principles and the requirements of
> the Applicable Laws of their respective domiciliary jurisdictions. PBLA shall take
> such steps as may be required for ULICO to receive full credit on ULICO's
> statutory financial statements for the reinsurance ceded under this Reinsurance
> Agreement. To that end, as of the Closing Date and at all times during the term of
> this Reinsurance Agreement, PBLA shall enter into the Reinsurance Trust
> Agreement and Comfort Trust Agreement as required by Section 4.2, and comply
> with all terms therein.

Dkt. No. 22-1, Art. IV § 4.1(a).

The next section, Section 4.2 ("Reinsurance Trust and Comfort Trust"), requires the

parties to enter into a second agreement to establish the account that will hold these reserves

("Reinsurance Trust Account" or "Trust Account").  The relevant provision provides that:

> ULICO and PBLA shall enter into a Reinsurance Trust Agreement and Comfort
> Trust Agreement substantially in the form attached hereto as Exhibit B and Exhibit
> C, respectively, to be effective concurrent with this Reinsurance Agreement. The
> Reinsurance Trust Agreement shall contain those provisions necessary to effect the
> terms and conditions of this Reinsurance Agreement and shall comply with the
> requirements of Chapter 6 of the Insurance Code of Puerto Rico. PBLA shall
> establish in accordance with the Reinsurance Trust Agreement and the Comfort

2

Trust Agreement, respectively, the Reinsurance Trust Account and the Comfort Trust Account each with an independent financial institution reasonably acceptable to ULICO for the sole use and benefit of ULICO, for so long as there are Insurance Policies reinsured under this Reinsurance Agreement. Collateral with an aggregate Fair Market Value equal to one hundred and two percent (102%) of Statutory Reserves will be held within the Reinsurance Trust Account in accordance with Article 11 of Rule 98 of the Insurance Code of Puerto Rico.  Excess collateral with an aggregate Book Value equal to three percent (3%) of the Statutory Reserves will be held in the Comfort Trust Account for the benefit of ULICO; provided that such excess collateral shall increase to an aggregate Book Value equal to five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

Dkt. No. 22-1, Art. IV § 4.2(a).

Under Section 10.1 ("Arbitration") of Article X ("Miscellaneous Provisions"), the parties consented to arbitration concerning disputes arising under or relating to the Reinsurance Agreement:

Except as otherwise provided in this Reinsurance Agreement, all disputes or differences between the Parties arising under or relating to this Reinsurance Agreement upon which an amicable understanding cannot be reached shall be decided by arbitration pursuant to the terms of this Section.  Except as otherwise provided in this Reinsurance Agreement, the arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

Dkt. No. 22-1, Art. X § 10.1(a).  In the same article, Section 10.6 ("Entire Agreement") provides that:

This Reinsurance Agreement, the Reinsurance Trust Agreement and Comfort Trust Agreement supersede all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes (along with the exhibits, schedules and other documents delivered pursuant to this Reinsurance Agreement, the Reinsurance Trust and Comfort Trust Agreement) a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. This Reinsurance Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Reinsurance Agreement executed by the Parties.

Dkt. No. 22-1, Art. X § 10.6.

## 2.    Trust Agreement

The Reinsurance Agreement had attached as Exhibit B a reinsurance trust agreement by and among Wilmington Trust, National Association ("Wilmington Trust"), PBLA, and ULICO with an execution date of June 30, 2017.  Dkt. No. 22-1, Ex. B.  That agreement was signed by all parties, including Wilmington Trust.  However, PBLA and ULICO agree that that agreement is not now the operative agreement but rather a "specimen" trust agreement that would be replaced once another trustee was engaged.  *See* Dkt. No. 29 at 8-9; Dkt. No. 30 at 2-3.

The operative reinsurance trust agreement became effective on February 16, 2018 ("Reinsurance Trust Agreement" or "Trust Agreement").  Dkt. No. 22-2.  The parties to the Reinsurance Trust Agreement are The Bank of New York Mellon ("Trustee"), PBLA, and ULICO.  *Id.*

Section 2.2(a) ("Deposit of Assets") of Article II ("Creation of Trust Account; Deposit of Assets") of the Trust Agreement is similar to that of Section 4.2(a) in the Reinsurance Agreement.  It provides that:

> On or before the Effective Date, [PBLA] shall deposit in the Reinsurance Trust Account Assets that comply with the Investment Guidelines (the "Qualifying Trust") with an aggregate Fair Market Value equal to one hundred and two percent (102%) of the Statutory Reserve as of the Effective Time. The Assets deposited in the Reinsurance Trust Account shall be valued according to their current Fair Market Value shall consist only of Qualifying Trust Assets and shall be invested in accordance with the Investment Guidelines or as otherwise mutually agreed in writing by [PBLA] and [ULICO].

Dkt. No. 22-2, Art. II § 2.2(a).  It also has a section establishing the procedure for depositing assets consisting of loans under Section 2.3 ("Deposit of Assets Consisting of Loans").  The other sections in the Trust Agreement relate to the creation of the Reinsurance Trust Account, the withdrawal or transfer of assets, the maintenance of the Reinsurance Trust Account, the duties and responsibilities of the trustee, and other procedures related to establishing and maintaining

the Reinsurance Trust Account.

Section 6.5 ("Governing Law; Waiver of Jury Trial") of Article VI ("Miscellaneous

Provisions") does not have an arbitration clause, but rather requires that:

> (a) This [Trust] Agreement shall be construed in accordance with the substantive laws of the State of New York, without regard to conflicts of laws principles thereof. Each Party hereby waives any and all rights to trial by jury in any proceeding arising out of or relating to this Agreement. Each Party consents to the jurisdiction of any state or federal court situated in New York City, New York in connection with any dispute arising hereunder. . . . The establishment and maintenance of the Reinsurance Trust Account, and all interests, duties and obligations with respect thereto, shall be governed by the laws of the State of New York.

> (b) Each of the Parties hereby submits to the personal jurisdiction of and each agrees that all proceedings relating hereto shall be brought in courts located within the City and State of New York or elsewhere as the Trustee may select.

Dkt. No. 22-2, Art. VI § 6.5.  In the same article, Section 6.4 ("Entire Agreement") states that the

Trust Agreement supersedes all prior agreements "with respect to its subject matter":

> This Reinsurance Trust Agreement supersedes all prior agreements, whether written or oral, among the Parties with respect to its subject matter and constitutes (along with the attached exhibit(s)) a complete and exclusive statement of the terms of the agreement among the Parties with respect to its subject matter. This Reinsurance Trust Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Reinsurance Trust Agreement executed by the Parties.

Dkt. No. 22-2, Art. VI § 6.4.

**B.    Alleged Breach of Contract and Commencement of Arbitration**

On January 16, 2020, ULICO sent PBLA a written notice of breach alleging that the

assets held in the Trust Agreement were not compliant with Section 4.2(a) of the Reinsurance

Agreement, in particular, that provision's requirement that collateral be "in accordance with

Article 11 of Rule 98 of the Insurance Code of Puerto Rico."  Dkt. No. 21-1.  Article 11(D)(1)(b)

of Rule 98 requires that "investments in or issued by an entity controlling, controlled by or under

common control with either the grantor or the beneficiary of the [Reinsurance Trust Account]

5

shall not exceed ten percent (10%) of total investments." *Id.* ULICO claimed that over 65% of the assets held in the Reinsurance Trust Account are loan obligations of PBLA's affiliated entities and therefore violated this 10% rule. *Id.* ULICO demanded that PBLA cure the breach within ten (10) business days from the receipt of its letter. *Id.*

On January 24, 2020, PBLA responded to ULICO in a letter, denying that it was in violation of either Section 4.2(a) of the Reinsurance Agreement or Article 11 of Rule 98 of the Insurance Code of Puerto Rico. Dkt. No. 21-2. ULICO replied with a formal written demand for arbitration on January 27, 2020. Dkt. No. 21-3. ULICO later notified PBLA on February 24, 2020 that it had named its arbitrator. Dkt. No. 21-5, Ex. B.

In a letter dated February 25, 2020, PBLA denied the alleged breach and denied that the dispute was subject to arbitration under the Reinsurance Agreement. Dkt. No. 21-4. Instead, PBLA argued that the dispute was subject to litigation under the Trust Agreement. PBLA argued that the dispute falls within the subject matter of the Trust Agreement because ULICO's dispute concerns the assets held in the Trust Agreement, to which Section 4.2(a) of the Reinsurance Agreement also refers. But because Section 6.4 of the Trust Agreement provides that the Trust Agreement supersedes prior agreements "with respect to its subject matter," PBLA argued that the Trust Agreement supersedes the Reinsurance Agreement with respect to issues concerning the assets held in the Trust Account. As a result, PBLA argued, the Trust Agreement's forum-selection clause, not the Reinsurance Agreement's arbitration clause, applied to the dispute, which must be brought in a New York court.

On March 4, 2020, ULICO contacted the American Arbitration Association ("AAA") to request that it appoint an arbitrator on PBLA's behalf. Dkt. No. 21-5. The AAA informed the parties that it would provide them with the name of the selected arbitrator shortly. Dkt. No.

21-6.  On March 13, 2020, PBLA sent a letter to the AAA, repeating that it did not consent to arbitration.  Dkt. No. 21-7.

### C.      The Instant Litigation

On March 16, 2020, PBLA filed this action to seek a judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201, 2202, declaring that the dispute between it and ULICO was not subject to arbitration but must be litigated in federal or state courts in New York City under Section 6.5 of the Trust Agreement.  Dkt. No. 5.  The Court held an initial pretrial conference on April 14, 2020.  On April 21, 2020, ULICO filed the instant motion to compel arbitration.  Dkt. No. 14.

On April 27, 2020, PBLA filed an emergency motion for a temporary restraining order ("TRO") and preliminary injunction.  Dkt. No. 19.  The motion asked that ULICO be prohibited from proceeding with the arbitration until the Court had ruled on the motion to compel arbitration.  The impetus for this request was an email the arbitration panel sent the prior day, notifying the parties that a preliminary hearing in the arbitration would take place on April 29.[1]

The Court held a hearing later that afternoon on April 27.  *See* Dkt. No. 29-1.  After reading the papers and hearing from the parties, the Court concluded that the merits were in equipoise such that PBLA had not established a likelihood of success.  It also concluded that proceeding with a preliminary arbitration hearing, which PBLA had likened to a Rule 16 conference, did not establish irreparable harm, though proceeding with arbitration beyond that hearing to the point where there may be findings might result in irreparable harm.  The Court denied the motion for the TRO and preliminary injunction to the extent that it sought to enjoin

---

[1] On April 22, the arbitration panel asked the parties for their availability for this preliminary hearing during the weeks of April 30 and May 5.  On April 24, ULICO responded with its preference for April 29.  PBLA had not responded before the panel, on April 26, selected April 29 as the date for the hearing.  Dkt Nos. 21-8, 21-9; *see also* Dkt. No. 20 at 8.

the arbitration hearing on April 29.  However, the Court stated it would consider the TRO and preliminary injunction with respect to the issue of enjoining the arbitration as a whole and asked the parties to consider whether the motion should be converted to a motion to permanently enjoin the arbitration.  The parties submitted a letter to the Court on April 28 converting the motion to one for a permanent injunction.  Dkt. No. 26.

ULICO and PBLA submitted additional briefing regarding the permanent injunction and the motion to compel arbitration.  Dkt. Nos. 27, 29-30.

## LEGAL STANDARD

Section 4 of the FAA provides that "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  Section 3 requires courts to stay litigation of proceedings that are referable to arbitration.  9 U.S.C. § 3.

Before the Court can compel arbitration and stay such proceedings, however, it must determine: (1) whether there is a valid agreement to arbitrate; (2) whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate; and (3) whether the dispute does fall within the scope—the question of arbitrability.  *See AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-50 (1986).  If the parties evidenced a "clear and unmistakable" intent to submit the dispute to an arbitrator, then the Court shall delegate the third question to the arbitrator.  *Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. 524, 530 (2019).  "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Id.*; *see also Republic of Ecuador v. Chevron Corp*., 638 F.3d 384, 393 (2d Cir. 2011) (questions of arbitrability "should be decided by the courts unless there is clear and unmistakable evidence from the arbitration agreement"

that the parties intended the dispute to be decided by the arbitrator) (citation and internal

quotation marks omitted).

"In the context of motions to compel arbitration brought under the Federal Arbitration

Act . . . the court applies a standard similar to that applicable for a motion for summary

judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  However, "[i]f there is

an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Id.*

The parties agree that the language of the two agreements is unambiguous, *see* Dkt. No. 29-1 at

25:11-12, and the issue here is one of law.

## DISCUSSION

### A.    Whether a Valid Arbitration Agreement Exists

At the outset, the Court must assess the "very existence of the contract embodying the

arbitration clause."  *Republic of Ecuador*, 638 F.3d at 392 (quoting *Specht v. Netscape*

*Commc'ns Corp*., 306 F.3d 17, 26 (2d Cir. 2002)).  Unlike the "enforceability or applicability" of

an arbitration agreement, which may be delegated to an arbitrator, questions regarding the

"formation of the parties' arbitration agreement" must be decided by a court.  *Doctor's Assocs.,*

*Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (quoting *Granite Rock Co. v. Int'l*

*Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010)); *id.* ("Arguments that an agreement to

arbitrate was never formed . . . are to be heard by the court even where a delegation clause

exists.") (citation omitted); *see also Hines v. Overstock.com, Inc*., 380 F. App'x 22, 24 (2d Cir.

2010) (moving party need not "show initially that the agreement would be *enforceable*, merely

that one existed").  That is because "[a]n agreement that has not been properly formed is not

merely an unenforceable contract; it is not a contract at all."  *Doctor's Assocs.*, 934 F.3d at 251.

"And if it is not a contract, it cannot serve as the basis for compelling arbitration."  *Id.*; *see* 9

U.S.C. § 2 ("A written provision in . . . *a contract* evidencing a transaction involving commerce

to settle by arbitration a controversy thereafter arising out of *such contract* . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").

The parties here agree that the Reinsurance Agreement, when signed, was valid and binding, as was its arbitration agreement.  That fact would not necessarily be conclusive as to the existence today of a valid and binding arbitration agreement between the parties, for even a valid arbitration agreement can be superseded and replaced.  *See infra* at 16-17.  But the parties also agree that there continues to exist an arbitration clause and a Reinsurance Agreement that bind the parties.  *See* Dkt. No. 29 at 17, 19.  Indeed, there could be no substantial dispute between the parties as to that issue and that both the Reinsurance Agreement and an arbitration clause survive the signing of the Trust Agreement.

First, the Reinsurance Agreement unambiguously states that only a subsequent agreement that explicitly identifies itself as an amendment to the Reinsurance Agreement can amend or otherwise supersede that agreement.  It provides, "This Reinsurance Agreement may not be amended, supplemented or otherwise modified *except by a written agreement that identifies itself as an amendment to this Reinsurance Agreement* executed by the Parties."  Dkt. No. 22-1, Art. X § 10.6 (emphasis added).

"Under Puerto Rican law, an agreement is 'clear' when it can be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation."[2] *Lopez & Medina Corp. v. Marsh USA, Inc.*, 694 F. Supp. 2d 119, 125 (D.P.R. 2010), *aff'd*, 667 F.3d 58

---

[2] A court generally applies ordinary state law principles that govern the formation of contracts to determine whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  The Reinsurance Agreement applies Puerto Rican law, while the Trust Agreement requires New York law.  *Compare* Dkt No. 22-1, Art. X § 10.7 *with* Dkt. No. 22-2, Art. VI § 6.5(a).

(1st Cir. 2012).  "[I]n cases where the contractual terms are clear, the Court is constrained to give the language of the policies its literal meaning and must restrain itself from indulging in an analysis of the alleged intent of the parties."  *Id.* (citing *Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.*, 23 F.3d 564, 567 (1st Cir. 1994)).  In addition, the Reinsurance Agreement directs, "The Parties acknowledge and agree this Reinsurance Agreement . . . shall be construed and interpreted according to the ordinary meaning of the words."  Dkt. No. 22-1, Art. X § 10.8.

The ordinary meaning of "identify," as applicable here, is "to prove the identity of (a person or thing)."  Black's Law Dictionary (11th ed. 2019).[3]  Other definitions of "identify" support this reading.  *See* Merriam-Webster.com, http://www.merriam-webster.com/dictionary/identify (last visited May 8, 2020) (defining "identify" as "to know and say who someone is or what something is," "to find out who someone is or what something is," and "to show who someone is or what something is"); Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_denglish/identify (last visited May 8, 2020) (offering, among other definitions, "to establish or indicate who or what (someone or something) is," "to prove, reveal, or declare one's identity," and "to locate and recognize").  This definition accords with the purpose of Section 10.6 when read in context.  *See Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 91 (1st Cir. 2011) ("[T]he trier cannot stop at the literal sense, but must fundamentally investigate the intent of the parties and the spirit and purpose of the transaction.") (quoting

---

[3] Black's Law Dictionary provides alternative definitions of "identify" as "to look on as being associated (with)," or "to specify (certain goods) as the object of a contract."  Black's Law Dictionary (11th ed. 2019).  PBLA does not argue for either alternative definition.  The former definition is associational, such as identifying "with" or "as" a member of category or group.  If read to mean that any agreement associated with the Reinsurance Agreement, on any subject, was an amendment of it, that definition would deprive "identify" of any independent meaning. Every purported amendment, by its nature, relates to or can be associated with, the contract it purports to amend.  The latter definition relates to contracts involving goods and is not applicable here.

*Marcial v. Tome*, 144 P.R. Dec. 522, 537 (1997)).

Section 10.6 of the Reinsurance Agreement contemplated that the parties would need to negotiate and sign a number of different and related agreements in order to accomplish the purpose of the Reinsurance Agreement, which is to "set forth [the parties'] rights and obligations in relation to this transfer of liability by ULICO to PBLA."  Dkt. No. 22-1 at 3; *see also id.*, Art. IV § 4.2(a) (establishing the Trust Agreement and Comfort Trust Agreement).  The language of Section 10.6 was intended to make clear that only that subset of agreements (if any) that explicitly identified themselves as amendments to the Reinsurance Agreement would effectuate amendments to the Reinsurance Agreement.[4]  Unless the subsequent agreement identified itself as an amendment to the Reinsurance Agreement, the provisions of the Reinsurance Agreement would survive.[5]

The Trust Agreement does not identify itself as an amendment to the Reinsurance Agreement.  To identify itself as an amendment to the Reinsurance Agreement, the Trust

―――――――――――――――

[4] Section 10.6 was also intended to provide certainty to the parties and relieve them from having to engage in that "uncertain and uncommercial exercise of clause-by-clause comparison of contract provisions" in order to determine whether a subsequent agreement amended the terms and conditions of the earlier agreement.  Dkt. No. 30 at 11.  If the parties intended to amend the earlier agreement, all they needed to do was say so explicitly and identify the later agreement as an amendment of the earlier agreement.  If they did not, the earlier agreement would survive.

[5] Indeed, while PBLA relies on Section 10.6 of the Reinsurance Agreement to support the proposition that the Trust Agreement identifies itself as an amendment to the Reinsurance Agreement, that language undercuts PBLA's argument.  Section 10.6 recognizes that at least two documents other than the Reinsurance Agreement will affect the subject matter of the agreement between the parties:  "This Reinsurance Agreement, the Reinsurance Trust Agreement and Comfort Trust Agreement [together] supersede all prior agreement, whether written or oral, between the Parties with respect to its subject matter."  Dkt. No. 22-1, Art. X § 10.6.  The parties thus recognized that, in addition to the Reinsurance Agreement, there would be a need for a Trust Agreement and a Comfort Trust Agreement.  They also recognized that those documents would be finalized and signed after the Reinsurance Agreement.  The understanding of the parties is plain that they did not intend the finalization of the Trust Agreement and the Comfort Trust Agreement themselves to effectuate an amendment of the Reinsurance Agreement, but to be read in a manner complementary to the Reinsurance Agreement.

Agreement would need to "prove" its identity, "say" that it is such amendment," or "declare" its identity as an amendment of the Reinsurance Agreement.  The Trust Agreement does no such thing.  Its integration clause makes no reference whatsoever to the Reinsurance Agreement.  It states that it "supersedes all prior agreements . . . with respect to its subject matter," Dkt. No. 22-2, Art. VI § 6.4, but that does not prove, say, or declare its identity as an *amendment to the Reinsurance Agreement*, either implicitly or explicitly.  The integration clause of the Trust Agreement has a function, but it is not the function PBLA ascribes to it.  It makes clear that, as both parties agree, the Trust Agreement supersedes the "specimen" trust agreement entered into by ULICO, PBLA, and Wilmington Trust.  *See* Dkt. No. 29 at 8-9; Dkt. No. 30 at 2-3.  It does not replace all the understandings in the Reinsurance Agreement itself.

Second, the Trust Agreement cannot fully amend or replace the Reinsurance Agreement or its arbitration clause, for the very simple additional reason that the Trust Agreement's own continued existence depends on the continued existence of the Reinsurance Agreement.  It cannot endure without the Reinsurance Agreement.

Section 4.2 of the Reinsurance Agreement sets forth the purpose of the Trust Agreement, which is made in reference to the Reinsurance Agreement.  It requires that the parties, ULICO and PBLA, enter into the Trust Agreement to "contain those provisions necessary to effect the terms and conditions of this Reinsurance Agreement."  Dkt. No. 22-1, Art. IV § 4.2(a).  The preamble of the Trust Agreement similarly acknowledges that it was created to effectuate the Reinsurance Agreement.  Because PBLA "has agreed to provide security to [ULICO] for the payment of amounts due under the Reinsurance Agreement," now PBLA and ULICO "desire to enter into this Reinsurance Trust Agreement and create a trust account . . . with the Trustee for the benefit of [ULICO] to hold cash and assets [] as security for the payment of certain amounts

due under the Reinsurance Agreement." Dkt. No. 22-2 at 1.

Indeed, the Trust Agreement depends for its very operation on the continued existence of the Reinsurance Agreement. For example, it is the Reinsurance Agreement—and not the Trust Agreement—that sets forth the payment obligations between PBLA and ULICO. In the absence of the continued existence of the Reinsurance Agreement, there would be no payment obligations. *See* Dkt. No. 22-1, Art. III § 3.2 (setting forth reporting and payments obligations). Similarly, the Reinsurance Agreement contains other provisions setting forth the scope of the reinsurance without which the Trust Agreement would be meaningless. *See, e.g.*, *id.*, Art. II § 2.1(a) (PBLA agrees to reinsure 75% quota-share of insurance liabilities with respect to each of the insurance policies); *id.*, Art. II § 2.1(c) (the Reinsurance Agreement is the exclusive reinsurance arrangement for newly issued fixed annuity business sold in Puerto Rico for PBLA and ULICO); *id.*, § 4.3 (describing the use of funds by ULICO in the Trust Account). And the Trust Agreement explicitly incorporates several of the obligations established in the Reinsurance Agreement. *See* Dkt. No. 22-2, Art. I (defining "Insurance Policy," "Overcollateralization Trigger," and "Statutory Reserve" with reference to the Reinsurance Agreement).

Thus, the Trust Agreement was not intended to supersede the terms and conditions of the Reinsurance Agreement but rather to be read in conjunction with them. This conclusion is reflected by the language in Section 4.2(a) of the Reinsurance Agreement, which states that "ULICO and PBLA shall enter into a Reinsurance Trust Agreement and Comfort Trust Agreement substantially in the form attached hereto as Exhibit B and Exhibit C, respectively, to be *effective concurrent with this Reinsurance Agreement. The Reinsurance Trust Agreement shall contain those provisions necessary to effect the terms and conditions of this Reinsurance Agreement* and shall comply with the requirements of Chapter 6 of the Insurance Code of Puerto

Rico."  Dkt. No. 22-1, Art. IV § 4.2(a) (emphasis added).

Third, as ULICO persuasively argues, an interpretation that leads to the Trust Agreement replacing the Reinsurance Agreement and its arbitration clause in its entirety would produce "a result that is absurd, commercially unreasonable or contrary to the reasonable expectation of the parties," and such "absurd results should be avoided."  *Atlas Partners, LLC v. STMicroelectronics, Int'l. N.V.*, 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S. 2d 346, 346 (1st Dep't 2010) (internal quotation marks omitted)); *see also S.L.G. Irizarry v. S.L.G. Garcia*, 2001 TSPR 161 (P.R. Nov. 27, 2001) ("[O]ne cannot seek to obfuscate or distort the interpretation of contracts to reach absurd or unfair results.").  By its terms, the forum-selection clause in the Trust Agreement addresses only disputes among the Trustee, ULICO, and PBLA relating to the subject matter of the Trust Agreement.  *See* Dkt. No. 22-2, Art. VI § 6.5(b).  But there are many provisions of the Reinsurance Agreement that do not relate to the subject matter of the Trust Agreement.  Taking PBLA's argument to its logical conclusion would leave the parties with no dispute resolution mechanism whatsoever with respect to any of those potential disagreements.

Fourth, to hold that the Trust Agreement and its forum-selection clause do not replace the Reinsurance Agreement and its arbitration clause does not deprive the Trust Agreement and that forum-selection clause of meaning.  Without saying whether this particular dispute falls within the scope of the arbitration clause of the Reinsurance Agreement or the forum-selection clause of the Trust Agreement—a question that the Court concludes the arbitrator will decide—there is ample room for the operation of the forum-selection clause in the many disputes that would not rest on or come within the scope of the Reinsurance Agreement.  The documents can be read in a complementary fashion.  *See Dome Tech., LLC v. Golden Sands Gen. Contractors, Inc.*, 2017

WL 5071264, at *5 (D. Conn. Nov. 3, 2017) (holding that arbitration clause survives where contractual provisions can be read in complementary fashion and collecting cases); *see also Offshore Expl. & Prod. LLC v. Morgan Stanley Private Bank, N.A.*, 986 F. Supp. 2d 308, 320 (S.D.N.Y. 2013), *aff'd*, 626 F. App'x 303 (2d Cir. 2015) ("[I]f the forum selection and arbitration clauses can be harmonized in a way 'that permits the [a]rbitration [c]lause to remain in effect,' that reading must prevail.") (quoting *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005), *abrogated on other grounds by Granite Rock Co.*, 561 U.S. at 299-300).

The Reinsurance Agreement sends to arbitration "all disputes or differences between [ULICO and PBLA] arising under or relating to th[e] Reinsurance Agreement." Dkt. No. 22-1, Art. X § 10.1. The forum-selection clause of the Trust Agreement provides that "[e]ach Party hereby waives any and all rights to trial by jury in any proceeding arising out of or relating to this [Trust] Agreement" and "agrees that all proceedings relating hereto shall be brought in courts located within the City and State of New York *or elsewhere as the Trustee may select*." Dkt. No. 22-2, Art. VI § 6.5(b) (emphasis added). At a minimum, then, disputes that relate to the Trust Agreement and that do not arise under or relate to the Reinsurance Agreement (including disputes with the Trustee) are governed by the forum-selection clause of the Trust Agreement.

Finally, *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522 (2d Cir. 2011) and *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210 (2d Cir. 2014), upon which PBLA rely, are not apposite. Those cases stand for the unexceptional (and undisputed) proposition that parties who have agreed to an arbitration clause can later agree that their disputes will be litigated and not arbitrated. "[C]ontracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly

preclude arbitration." *Applied Energetics, Inc.*, 645 F.3d at 525.  In both cases, there was a clear contractual intent among the parties that the forum-selection clause would replace the arbitration agreement.  Neither case addresses the circumstance here where the forum-selection clause is contained within an agreement that, by its terms, does not amend the contract containing the arbitration clause.

In *Applied Energetics*, for example, the first agreement, an engagement agreement, "specifically contemplated that the parties would enter into a subsequent, more formal agreement setting forth 'the terms and conditions contained [in the Engagement Agreement] as well as those customarily contained in agreements of such character.'"  645 F.3d at 523.  That subsequent agreement was intended to constitute the "entire understanding and agreement" of the parties and to supersede any such prior agreements including the engagement agreement.  *Id.* at 523-24.  It thus reflected the commonplace situation where parties agree on the basic terms of their contractual arrangement that they expect to be superseded in its entirety by formal documentation.  In that circumstance, enforcing the subsequent forum-selection clause simply honors the intent of the parties.

In *Goldman Sachs*, the parties contracted against a default arbitration FINRA rule for disputes between FINRA members and customers.  Golden Empire had retained Goldman as its underwriter and broker-dealer through two types of contracts: an underwriter agreement that was silent as to dispute resolution and a broker-dealer agreement with a forum-selection clause.  Golden Empire brought suit against Goldman, alleging that it fraudulently induced it to issue debt in the form of auction rate securities.  Golden Empire argued that the background arbitration rule applied, but the Second Circuit held that the forum-selection clause superseded the obligation to arbitrate.  Its holding was based on the finding that the forum-selection clause was

"broadly worded" because it encompassed "all actions and proceedings arising out of . . . *any of the transactions contemplated*" by the broker-dealer agreements.  764 F.3d at 216 (emphasis added).  As a result, the clause contemplated that any dispute related to any transaction between the parties was to be litigated.  In contrast, the language of the Trust Agreement's forum-selection clause is not so broadly worded so as to supersede the Reinsurance Agreement or its arbitration clause.  Both clauses can be read in harmony.[6]

        As even PBLA admits, the intent of the Trust Agreement was not to replace or supersede the Reinsurance Agreement nor its arbitration clause as that clause related to disputes arising out of the Reinsurance Agreement.  To so read the Trust Agreement would deprive the language of the Reinsurance Agreement of meaning and would lead to nonsensical results.  Accordingly, the Court now turns to the question whether—based on the continued existence of the arbitration clause in the Reinsurance Agreement—the dispute between the parties falls within the scope of that clause and, in the first instance, whether that issue is for the Court or the arbitrator to decide.

**B.      Whether the Court or the Arbitrator Should Decide the Question of Arbitrability**

        Although PBLA frames its arguments in the language of whether there is a valid arbitration agreement, its contention—properly understood—is to whether the provisions of the Reinsurance Agreement upon which ULICO relies survive the adoption of the Trust Agreement and, more particularly, whether that dispute as to whether the provisions of the Reinsurance Agreement apply should be determined by the Court or the arbitrator.

---

[6] And both *Applied Energetics* and *Goldman Sachs* involved agreements where the parties to the subsequent and prior agreements were the same, whereas here, the Trust Agreement is an agreement between three entities, one of whom is not a party to this litigation.  "It is difficult to see how such an incomplete set of parties . . . would be able to supersede a broader, prior agreement, especially where the relationship between the parties is structured by that prior agreement."  *Dome Tech.*, 2017 WL 5071264, at *6 (one party to subsequent agreement was not party to prior agreement).

PBLA argues that "[i]t is not possible for a claim to arise under Section 4.2 of the Reinsurance Agreement without also arising under [the] subsequent Trust Agreement," Dkt. No. 20 ¶ 30, and that "the portions of the Reinsurance Agreement relied on by ULICO were superseded by the Trust Agreement under the Trust Agreement's merger clause," Dkt. No. 29 at 6. It contends: "There is no such valid [arbitration] agreement here that would govern the parties dispute," Dkt. No. 29 at 14, and, "[T]he Trust Agreement's mandatory forum-selection clause . . . plainly governs the subject matter of the parties' dispute," *id.* at 23. Those questions are addressed not to the continued subsistence of an arbitration agreement between the parties but to whether the present dispute comes within the scope of that arbitration agreement.

The Court thus turns to the question of whether the dispute between the Parties, as framed by ULICO, falls within the scope of the arbitration clause of the Reinsurance Agreement or within the scope of the forum-selection clause of the Trust Agreement and, more particularly, whether it is for the Court or the arbitrator to decide that issue. This is a question of "arbitrability"—"whether the parties are bound by a given arbitration clause" and "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Here, the question is whether the arbitration clause in the concededly binding Reinsurance Agreement applies to a dispute that is also addressed in the Trust Agreement.

Under the parties' agreement, the question of whether ULICO's dispute should be arbitrated falls within the power of the arbitrators to decide. The arbitration provision is broad. Section 10.1 of the Reinsurance Agreement requires arbitration for "all disputes or differences between the Parties arising under or relating to this Reinsurance Agreement upon which amicable understanding cannot be reached." Dkt. No. 22-1, Art. X § 10.1. This broad language

of "all disputes" "arising under or relating to" constitutes "the paradigm of a broad" arbitration agreement.  *Offshore Expl.*, 986 F. Supp. 2d at 316 (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)).  "Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'"  *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (quoting *Collins*, 58 F.3d at 23).  This is so because "[w]hen parties use expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated."  *Id.* at 225.

Moreover, and perhaps more to the point, the arbitration language in the Reinsurance Agreement explicitly incorporates the rules of the AAA.  It thus vests in the arbitrator the decision whether this dispute falls within the scope of the arbitration clause.  "[A] signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules" may not "disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability."  *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005); *see also Jacobs v. U.S. Anti-Doping Agency*, 2004 WL 5003951, at *4 (S.D.N.Y. May 19, 2004) (where arbitration provision incorporated AAA rules, "the parties . . . agreed that all questions regarding the existence, validity, and scope of their arbitration agreement should be decided by an AAA arbitrator rather than by a court"), *aff'd sub nom. Jacobs v. USA Track & Field*, 374 F.3d 85 (2d Cir. 2004)

ULICO alleges that PBLA violated Section 4.2(a) of the Reinsurance Agreement.  If PBLA wishes to argue that such provision does not survive the passage of the Trust Agreement or that a dispute that implicates both the Trust Agreement and the Reinsurance Agreement is

outside the scope of the arbitration clause of the Reinsurance Agreement, that argument is properly presented to the arbitrator.  That is the agreement the parties struck.  Thus, "[t]he short—and sufficient—response . . .  is that, consistent with *Contec*, the parties agreed in the [Reinsurance] Agreement that questions concerning whether this dispute [is] encompassed within the arbitration clause of the [Reinsurance Agreement] should be decided by the arbitrators."  *Offshore Expl.*, 986 F. Supp. 2d at 316.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED.  Because the Court grants the motion to compel arbitration, the Court DENIES the motion for a permanent injunction of the arbitration.  Plaintiff can show neither a likelihood of success (the question of arbitrability is for the arbitrator) nor, having agreed to let the arbitrator decide arbitrability, can Plaintiff argue that it will suffer irreparable harm by letting the arbitrator do just that.  This matter is STAYED during the pendency of the arbitration pursuant to 9 U.S.C. § 3.

The Clerk of Court is respectfully directed to close Dkt. Nos. 14 and 19.

SO ORDERED.

Dated: May 12, 2020  
     New York, New York                           LEWIS J. LIMAN  
                                                 United States District Judge