**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
PB Life and Annuity Co., Ltd., f/k/a Private
Bankers Life and Annuity Co., Ltd.,

                                 No. 20-cv-2284 (LJL)

               Plaintiff,

     v.

Universal Life Insurance Company,

               Defendant.
-----------------------------------------------------------x

**REPLY IN FURTHER SUPPORT OF**
**UNIVERSAL LIFE INSURANCE COMPANY'S**
**<u>MOTION TO CONFIRM ARBITRATION AWARD</u>**

Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

*Attorneys for Universal Life*
*Insurance Company*

Defendant ULICO respectfully submits this reply in further support of its June 4, 2020 motion to confirm the Panel's unanimous June 2, 2020 Award (the "Award") under the New York Convention and the Federal Arbitration Act (9 U.S.C. §§ 9, 207).[1]

## REPLY STATEMENT OF FACTS

The arbitration proceeding that resulted in the Award was conducted before three arbitrators (the "Panel"), each of whom have over 40 years of experience in the insurance and reinsurance industries and are veterans of over 100 reinsurance arbitrations.[2]  As required by the arbitration clause at issue, the arbitration proceeding was conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA Rules").  *See* ECF No. 16-1, Reinsurance Agreement, § 10.1(a).  The AAA Rules compel efficiency: "a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed" (R-21(a)); parties are required to "be cooperative in scheduling the earliest practicable date" for a hearing (R-24); the "arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case" (R-32(b)).

On April 26, 2020, the Panel invited each party to submit a position statement and then scheduled a preliminary hearing on April 29, 2020 by telephone.[3]  In its position statement, ULICO declared its urgent need for a preliminary award requiring PBLA to return $524 million in cash and cash-equivalents that had been in the Trust Accounts (but which PBLA's controlling

---

[1] Pursuant to Rule 2(H) of Judge Liman's Individual Practices in Civil Cases, ULICO and PBLA have agreed that this reply brief shall be limited to 20 pages.

[2] *See* biographies of Mr. Kunze (https://www.arias-us.org/profile/?id=10176), Mr. Thirkill (https://www.arias-us.org/profile/?id=10144), and Mr. Schmidt (https://www.arias-us.org/profile/?id=10057).

[3] *See* July 9, 2020 Reply Affirmation of Michael A. Knoerzer ("Reply Affirmation") Ex. B, ULICO's Position Statement.  Exhibits B through P are attached to the Reply Affirmation.

owner had removed and replaced with the debt of his wholly-owned special purpose vehicles).
*Id.* at 8; *see also* Ex. C at 40:4-15.  Continuing its pattern of either ignoring the arbitration or
seeking to stop it,[4] PBLA sought an order enjoining the arbitration by order to show cause filed
April 27, 2020.  ECF No. 19.  During a hearing that same day, the Court asked for, and ULICO
provided, the arbitration schedule that ULICO planned to propose to the arbitrators for its
expedited motion for preliminary relief, including the scheduling of a substantive hearing by the
end of May 2020.  ECF No. 29-1 at 14:16-16:21.  PBLA did not raise before the Court any
objection to ULICO's proposed hearing schedule and the Court thereafter instructed ULICO to
advise the arbitrators to proceed without accelerating that schedule.  *Id.* at 24:8-25:3.  The Court
thereupon denied PBLA's motion for a preliminary injunction, ordered the parties to submit
briefs on an expedited basis, and declared that it would issue its ruling on PBLA's motion for a
permanent injunction before the arbitrators were scheduled to hear ULICO's expedited motion
for a preliminary award.  *Id.* at 24:8-20, 29:1-11, 30:9-31:15.

On April 29, 2020, the arbitrators and the parties conducted a preliminary conference as
called for by the AAA Rules.  *See* Ex. C.  ULICO advised the Panel of the Court's instructions as
to the arbitration schedule and the Panel acknowledged those instructions.  Upon deliberation
after the preliminary conference, the Panel issued a ruling on April 30, 2020 setting forth the
schedule for hearing ULICO's expedited motion, calling for ULICO to submit its papers on May
6, 2020, PBLA to submit opposition by May 20, 2020, and ULICO to submit a reply by May 27,
2020, with a hearing on May 29, 2020.  *See* Ex. D; Ex. B at 14.  PBLA made no objection to the
Panel's order as respects the briefing or hearing schedule.

---

[4] Despite the presence of an unambiguous arbitration clause in the Reinsurance Agreement,
PBLA took the curious position of refusing to "consent" to arbitrate, and later refused to select
an arbitrator, requiring the process to be conducted by the AAA.  *See* ECF No. 36-1, Ex. A at 3.

ULICO's May 6, 2020 submission to the Panel was akin to a motion for partial summary judgment in that it relied upon an argument about which there was no genuine issue of material fact.  ECF No. 41-7.  Through sworn witness statements[5] and with the able assistance of duly qualified counsel admitted in Puerto Rico, ULICO demonstrated that (1) the Reinsurance Agreement confirms the parties' agreement to comply with the mandatory requirements of  the insurance laws and regulations of Puerto Rico (*see* Ex. E, ¶ 10; Ex. F, ¶¶ 12, 17); (2) the insurance laws and regulations of Puerto Rico mandate that no more than 5% of the investments in a reinsurance trust account be related to the reinsurer or its affiliates (*see* Ex. F, ¶ 13); and (3) PBLA's own business records, submitted to ULICO on a quarterly basis, expressly reported that over 75% (or some $524 million) of the Trust Account assets constituted  "Related Party" investments (*see* Ex. K).  ULICO demonstrated exigency by its submission of: (1) evidence showing that it had raised its concerns to PBLA 18 months earlier but that PBLA had not responded (*see* Ex. H); (2) public statements from the rating agency AM Best showing that ULICO has been downgraded twice, expressly due to concerns about the nature of the assets in the Trust Account (*see* Ex. I); and (3) correspondence from the Puerto Rico Commissioner of Insurance, who wrote that "time is of the essence" with respect to ULICO's resolution of issues related to the Trust Account (*see* Ex. J).

PBLA, without qualified or admitted Puerto Rico counsel, did not seriously contest the requirements of Puerto Rico's insurance regulations and laws that no more than 5% of trust account assets be related-party investments.  Nor did PBLA deny that its own business records expressly admitted that the Trust Accounts were stuffed with "Related Party" assets (Ex. K) that did not comply with the laws and regulations of Puerto Rico.  Unable to overcome its

---

[5] *See* Ex. E, Witness Statement of Marcos Lugo-Camacho; Ex. F, Witness Statement of Raúl Ramírez; *see also* Ex. G, Supplemental Witness Statement of Raúl Ramírez.

documented admission that over $524 million of the Trust Assets were "Related Party" assets, PBLA sought to redirect the argument to a different topic. Instead of arguing that its assets are frozen (as it argues to this Court), PBLA argued to the arbitrators that the Trust Account assets were "safe, valuable and liquid," and that in any event, Mr. Lindberg, as ultimate owner of PBLA, was worth $3.8 billion and he himself was adequate security for PBLA's debts. *See* ECF No. 41-8 at 10. As support for its arguments, PBLA submitted a number of stale accountants' reports which themselves conceded that there is no liquid market for PBLA's Trust Account assets, in part because they all represent debt of Mr. Lindberg, an individual who, since those reports were written, was tried and convicted of multiple felonies and is currently awaiting sentencing. *See, e.g.*, ECF Nos. 41-9, 41-10, 41-11 (at Exs. N-S); ECF No. 41-1 at 9, 13-14.

On May 12, 2020, the Court issued its ruling granting ULICO's motion to compel arbitration and denying PBLA's motion to enjoin the arbitration. ECF No. 33. The Court expressly found the existence of an arbitration clause and, as contemplated by the AAA Rules, referred to the arbitrators all questions as to whether the parties' disputes fell within the scope of the arbitration clause.[6] On May 24, 2020, the Panel, after reviewing the Court's May 12 decision, as well as the arbitration clause and the parties' arguments, issued a ruling that the dispute falls within the scope of the arbitration agreement. Ex. L.

A hearing was held before the arbitrators on May 29, 2020, attended by the attorneys and ULICO's two witnesses, neither of whom PBLA requested to cross-examine. ECF No. 41-16. Thereafter, the Panel issued the Award. ECF Nos. 41-18, 36-1. First, the Panel noted the parties' written agreements about the arbitration process and the Panel's rulings:

---

[6] *See* ECF No. 33 at 20-21 ("If PBLA wishes to argue that . . . a dispute that implicates both the Trust Agreement and the Reinsurance Agreement is outside the scope of the arbitration clause of the Reinsurance Agreement, that argument is properly presented to the arbitrator. That is the agreement the parties struck.").

Section 10.1 (a) of the Reinsurance Agreement states that the arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules"), and Section 10.1 (d) instructs the arbitrators to enter an award that will "do justice" between the parties and that the award shall be supported by a written opinion.  That Section also states that the Panel "shall not be bound by legal rules of procedure and may receive evidence in such a way as to do justice between the Parties."

ECF No. 36-1 at 2.  The Panel declared that ULICO has demonstrated that exigent circumstances exist, and that PBLA has had more than ample opportunity to address ULICO's concerns:

After review and discussion, the Panel is persuaded that ULICO's assertions in respect of the assets (both as regards value and conformity) are correct and that ULICO has established an immediate need for the requested relief, so as to protect its policyholders and itself.  The Panel is also persuaded that PBLA has had more than ample time to present to this Panel standard financial information to counter ULICO's positions.

More specifically, ULICO through its Chief Investments Officer clearly and convincingly explained that ULICO has raised material issues concerning the type and value of the subject assets since late 2018; that PBLA's responses were neither timely, consistent, nor accurate; and that such responses directly led to ULICO's demand for arbitration in January 2020.

Furthermore, ever since these issues were raised by ULICO over 18 months ago, PBLA had every incentive and opportunity to obtain and present reports to ULICO and then to this Panel that clearly explained the true nature and fair market value of these assets and put forth its position as to whether the assets do conform to regulations.

Instead, PBLA presented outdated information that fails to support its claims and the requirement that these investments (in order of priority) are safe, liquid, and generate investment income, and their exhibits also fail to support its claims regarding control of assets.

This situation alone is sufficient for this Panel to grant ULICO's request. ULICO's complaints have been that PBLA replaced assets that do conform to regulatory requirements with assets that do not comply. PBLA is an 'unauthorized reinsurer' and has been repeatedly requested by ULICO to replace such non conforming assets.  Based on the evidence, the Panel concludes that PBLA has singularly failed to 'take such steps as may be required' of it to ensure that ULICO receive full credit on its financial statements, quite the opposite.

*Id.* at 4-5.  Addressing the substance of the parties' disputes, the Panel acknowledged the competing arguments about the value of the Trust Account assets, but left no doubt that the

question of whether the related-party assets complied with the laws and regulations of Puerto

Rico was paramount:

> Following the oral argument, the Panel commenced deliberation.  The Panel concluded that the question of the value of the assets in the Trust Fund is, of course, important (ULICO has argued $500M were of no value and PBLA argued the opposite), **but if such assets do not conform to the requirements of the Applicable Laws of Puerto Rico then ULICO would not receive full credit in its statutory financial statements as required by Section 4.1 (a) of the Reinsurance Agreement.**

*Id.* at 4 (emphasis added).

On the undisputed evidence, the Panel declared unanimously that the Trust Account

assets do not comply with the applicable Puerto Rico insurance laws and regulations.  *Id.* at 5.

The Award directed ULICO to establish a "segregated account under the supervision of the

Panel" and to identify the necessary account information to PBLA so that the amount of

$524,009,051.26 could be deposited by PBLA into that account.  *Id.* at 6.  The Award declared

that the "funds in the Segregated Account shall be used strictly for the purpose of securing

PBLA's obligations under the Reinsurance Agreement and, if necessary, for ULICO's payment

of any liabilities incurred pursuant to ULICO's obligations as respects business ceded to that

Reinsurance Agreement."  *Id.* at 7.  ULICO has since established and identified the segregated

account but PBLA has told ULICO and the Panel that it will not voluntarily honor the Award.

## ARGUMENT

A threshold issue is PBLA's request that the Court "reconsider its order" of May 12,

2020 granting ULICO's motion to compel arbitration.  ECF No. 40 at 23.  Local Civil Rule 6.3

governs "Motions for Reconsideration or Reargument" and requires that such motions be "served

within fourteen (14) days after the entry of the Court's determination of the original motion."

PBLA did not seek reconsideration within 14 days.  In any event, the Court's May 12 Order was

appropriately decided and PBLA does not on this motion challenge the Panel's determination

that the parties' dispute falls within the scope of the arbitration clause.

I.      **The North Carolina Consent Order Does Not Provide a Basis to Deny Confirmation of the Award.**

PBLA raises an argument not previously raised in prior proceedings before this Court, or

in the arbitration itself:  that PBLA allegedly cannot comply with its obligations under the

Reinsurance Agreement (including those obligations that are the subject of the Award) because

of an order on consent issued by a North Carolina court in October 2019 (the "Consent Order").

ECF No. 41-2.  PBLA does not tell the Court the facts about these proceedings.  Although

ULICO is not a party to the case, the Verified Amended Complaint and Motion for Preliminary

and Permanent Injunction (the "NC Complaint") (Ex. M) filed against PBLA in that action

provides a good summary of the North Carolina proceedings, which are briefly described below.

In June 2019, the North Carolina Department of Insurance, acting in its capacity as

Rehabilitator, took control of four insurance companies (the "NC Plaintiffs"), which to that point

had been owned and controlled by Mr. Lindberg.  *See* Ex. M at 1-2; Ex. N, Recital A, at 1.

Rehabilitation of the NC Plaintiffs was deemed necessary because certain "affiliated entities,"

which were purported to constitute a substantial portion of the NC Plaintiffs' investment

portfolio, were in fact not investments at all, but merely Mr. Lindberg's debt:

> A substantial portion of Plaintiffs' investments are debt facilities or equity
> financing arrangement with entities that are also under Lindberg's control.  These
> affiliated entities consist of operating and holding companies, special purpose
> vehicles, and trust, formed and incorporated in this state and others and overseas,
> which are in a complex network of interrelated loans, financing arrangements, and
> investments.
>
> In June 2019, Plaintiffs' long-term liquidity issues became severe enough to
> warrant Plaintiffs being placed into rehabilitation.  The success or failure of
> Plaintiffs' rehabilitation will turn on whether the Lindberg-controlled operating
> companies can generate sufficient revenue to repay affiliated investments, so that
> Plaintiffs can meet their long-term obligations to policyholders and creditors.  If

the affiliated companies fail to repay their debts, Plaintiffs' only alternative will be to foreclose on the debts and to initiate liquidation of the companies and their assets – which will result in a substantial shortfall.[7]

On June 27, 2019, the NC Plaintiffs, Mr. Lindberg, and other companies,[8] entered into a "Memorandum of Understanding" ("MOU") which expressly defined the Lindberg-controlled entities that constituted the NC Plaintiffs' investments as the "Specified Affiliated Companies" ("SACs") and detailed an agreed plan for the restoration of the NC Plaintiffs' financial condition in part by the remediation of the SACs.  Ex. N at 1.  According to a sworn statement submitted in court on behalf of Mr. Lindberg and certain of his companies, including PBLA, it was always understood by both the NC Plaintiffs and the NC Defendants that the MOU had the potential to affect ULICO's rights and therefore ULICO's consent was needed before the MOU could be effective against ULICO, but ULICO's consent had never been obtained.[9]

By October 2019, the NC Plaintiffs deemed Mr. Lindberg to have breached the MOU and therefore filed the NC Complaint against Mr. Lindberg, PBLA, and other Lindberg-controlled entities (the "NC Defendants").  Ex. M a 3.  The NC Complaint acknowledged that PBLA was not subject to the rehabilitation order: "PBLA is another insurance company owned, directly or indirectly, by Lindberg.  ***It is domiciled in Bermuda and is not subject to this Court's rehabilitation order***."  *Id.* ¶ 116, at 20 (emphasis added).  Although ULICO has never been a party to the North Carolina proceedings, the NC Plaintiffs publicly declared the impact upon ULICO of PBLA's misconduct:

> 117.   Universal Life Insurance Company ("ULICO") is a life and accident and health insurance company domiciled in Puerto Rico.
>
> 118.   PBLA serves as reinsurer for ULICO.

---

[7] Ex. M at 1-2.
[8] Mr. Lindberg purported to enter into the MOU on behalf of PBLA as its "attorney-in-fact."  *See* Ex. N, Recital C, at 1-2.
[9] Ex. O, October 30, 2019 Affidavit of Mohsin Y. Meghji, ¶ 6(a).

119.   Because of PBLA's own financial difficulties and other issues, ULICO recently experienced a financial strength rating downgrade from A.M. Best and faces possible further downgrade.

120.   Should ULICO experience further financial strength rating downgrades, it likely would be put into rehabilitation in Puerto Rico.[10]

A temporary restraining order was issued on October 1, 2019 against the NC Defendants (the "TRO").  ECF No. 41-1.  On October 7, 2019, the TRO was extended by consent of all parties, including PBLA (the "Consent Order").  ECF No. 41-2.  The Consent Order, among other things, prohibited the NC Defendants from:

- Further breaching the MOU;
- Taking actions inconsistent with maximizing the value of the NC Plaintiffs' SACs;
- Encumbering the SACs; and
- Entering into any contractual arrangement regarding the SACs.

ECF No. 41-1 at 4.  Finally, and most significantly for this matter, the Consent Order expressly exempts from its prohibitions the NC Defendants' conduct of their ordinary business operations:

transferring, withdrawing, concealing, defalcating, disposing of, or encumbering, or causing any affiliated company to transfer, withdraw, conceal, defalcate, dispose of, or encumber, any of the Defendants' assets, **other than the expenses of ordinary business operations, without express authority of the Court**.

*Id.* at 5 (emphasis added).  As set forth below, there are a number of reasons for denying PBLA's argument that the Consent Order constitutes a public policy basis not to confirm the Award.

### A.   By Not Raising Any Issues Pertaining to the Consent Order Before the Arbitrators, PBLA Has Forfeited Those Issues.

As a threshold issue, PBLA's failure to raise the putative effect of the Consent Order issue before the arbitration Panel constitutes an absolute bar against PBLA raising this argument in the first instance before the Court.  *See, e.g., Chem. Overseas Holdings, Inc. v. Republica*

---

[10] *Id.* ¶¶ 117-20, at 20.  The Verified Amended Complaint goes on to detail a failed negotiation between PBLA and ULICO to protect ULICO.  *Id.* at 21-22.  These negotiations were at all times negotiated in full knowledge of, and with the consent of, representatives of the North Carolina Rehabilitator.  *See* Ex. P, October 31, 2019 Affidavit of Chris Herwig, ¶ 11.

*Oriental Del Uruguay*, 371 F. Supp. 2d 400, 401 (S.D.N.Y. 2005), *aff'd*, 246 F. App'x 6 (2d Cir. 2006) ("If a party 'fail[s] to raise [an] issue ... to the arbitrators, the issue is forfeited.'") (quoting *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) (alterations supplied); *Yukos Cap., S.A.R.L. v. Samaraneftgaz*, 963 F. Supp. 2d. 289, 299 (S.D.N.Y. 2013) (party that chose not to raise an arbitrable issue before the arbitrators "cannot now rely on its own omissions to support a public policy defense"). If PBLA believed that the North Carolina Consent Order excused its contract obligations to ULICO, then PBLA was required to raise that argument before the arbitrators.[11] For this threshold reason, PBLA's argument that the Award cannot be confirmed on grounds of public policy must be summarily rejected.[12] However, even if the Court could consider PBLA's public policy argument for the first time on this motion, the Court must reject that argument.

### B. PBLA Has Not Met its High Burden of Establishing the Existence of a New York Public Policy That Would Require That the Award Not be Confirmed.

"The public policy exception in Article V(2)(b) of the Convention is very narrow, and applies only where enforcement of the award would violate 'the most basic notions of morality and justice' of the forum where enforcement is sought." *Telenor Mobile Commc'n v. Storm LLC*, 524 F. Supp. 2d 332, 356 (S.D.N.Y. 2007) (quoting *Europcar*, 156 F.3d at 315), *aff'd*, 584

---

[11] The question of whether PBLA could avoid its contractual obligations to ULICO because of the Consent Order would certainly be a question within the scope of the arbitration clause, which calls for arbitration of "all disputes or differences between the Parties arising under or relating to his Reinsurance Agreement." *See* ECF No. 16-1, ¶ §10.1(a).

[12] *McClain v. Cornell Univ.*, No. 98-CV-604, 2000 WL 362021, at *10 (N.D.N.Y. Mar. 31, 2000) ("Parties 'cannot stand by during arbitration, withholding certain arguments, then upon losing the arbitration, raise such arguments in federal court.'") (quoting *Nat'l Wrecking Co. v. Int'l Bd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993)), *aff'd*, 2 F. App'x 93 (2d Cir. 2001); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 45 (1987) (courts have limited authority on motions to vacate arbitration awards and "the fact that it is inquiring into a possible violation of public policy [does not] excuse a court for doing the arbitrator's task").

F.3d 396 (2d Cir. 2009).[13]  The party opposing enforcement of the arbitration award has the burden of proving that enforcement would violate New York's public policy.  *Europcar*, 156 F.3d at 313.  "When construing this section, the Court of Appeals for the Second Circuit has noted the 'pro-enforcement bias' of the Convention."  *Telenor*, 524 F. Supp. 2d at 356-57 (internal citations omitted).  "Public policy arguments, such as those presented here, should be accepted with caution, so as not to discourage enforcement of United States arbitration awards by courts of other countries."  *Id.* at 357 (citations omitted).

Because enforcement is sought in New York, it is New York's public policy that is in question.  *Europcar*, 156 F.3d at 315.  PBLA does not at all address New York public policy, which stands directly against the relief PBLA seeks.  "New York courts have explicitly cautioned against allowing a party to 'escape from [its contract] obligation on the pretext of public policy.'"  *Telenor*, 524 F. Supp. 2d at 358 (quoting *Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 679 (1974)).  "While the existence of a public policy against enforcement of arbitral awards that compel a violation of law is unclear, New York has a strong policy in favor of 'enforcing contracts and encouraging arbitration.'"  *Id.* (quoting *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 49 (1997)).

PBLA has not specifically identified any New York public policy that would be violated by confirming the Award.  Certainly, PBLA does not identify any violation of "the most basic notions of morality and justice" that would occur if the Award was enforced and PBLA was

---

[13] *See Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*, 737 F.2d 150 (2d Cir. 1984) (the public policy defense "must be construed in light of the overriding purpose of the Convention, which is 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'  Thus, this court has unequivocally stated that the public policy defense should be construed narrowly.  It should apply only where enforcement would violate our 'most basic notions of morality and justice.'").

required to honor its contractual obligations to ULICO.[14]  To the contrary, the failure to enforce

the ULICO's contract rights and the Award would offend New York's strong public policies in

favor of enforcing contract rights and arbitration awards.

C.   **ULICO is Not a Party to the North Carolina Proceedings or the Consent Order and its Contract Rights Cannot be Affected Thereby.**

Further weakening PBLA's public policy defense is the fact that the court order upon

which PBLA relies was issued on consent.  The Court of Appeals has expressly rejected

agreements by two parties that would have the effect of eliminating a third party's contract

rights, even where that agreement is "so-ordered" by a court.  *See, e.g.*, *Davis v. Blige*, 505 F.3d

90, 102-03 (2d Cir. 2007) ("Settlement agreements are not to be used as a device by which A and

B, the parties to the decree can (just because a judge is willing to give the parties' deal a judicial

imprimatur) take away the legal rights of C, a nonparty.") (citing *United States v. Bd. of Educ. of

City of Chicago*, 11 F.3d 668, 672-73 (7th Cir. 1993) ("A consent decree entered by a federal

court, like any other injunction . . . is not a proper vehicle for extinguishing the legal rights and

duties of third parties.")).  PBLA cannot freely enter into a foreign jurisdiction, voluntarily

consent to an agreement that purports to render it unable to perform under an independent

contract, and then plead that this inability to perform provides an excuse for its nonperformance.

*Lowenschuss v. Kane*, 520 F.2d 255, 265 (2d Cir. 1975) ("Impossibility caused by a judicial

order prohibiting performance will excuse a party's performance only if the fault of the party

owing performance did not contribute to the order."); *MG Ref. & Mktg., Inc. v. Knight Enters.,

Inc.*, 25 F. Supp. 2d 175, 188 (S.D.N.Y. 1998) (a court order issued with a party's consent is not

a sufficient defense to performance under a contract with a third party).

_____

[14] *Misco*, 484 U.S. at 43 ("a formulation of public policy based only on 'general considerations of supposed public interests' is not the sort that permits a court to set aside an arbitration award") (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)).

PBLA's reliance upon *Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaarkantoor, B.V.*, 574 F. Supp. 367 (S.D.N.Y. 1983) is misguided for several reasons.  ECF No. 40 at 22.  First, as this Court noted in *Telenor*, "*Sea Dragon* is not controlling law, as it does not bind this Court, was decided over two decades ago, and has not been relied upon for the relevant proposition since it was decided."  524 F. Supp. 2d at 348 (citing cases finding *Sea Dragon* inapposite).  Second, even if *Sea Dragon* remained good law, it is distinguishable because in that case, the party seeking confirmation of the arbitration award was given notice and an opportunity to be heard in the proceedings which resulted in the Court order that was relied upon to prevent enforcement of the arbitration award.  *See Sea Dragon*, 574 F. Supp. at 372 n.2.  The *Telenor* court distinguished *Sea Dragon* on that basis,[15] and this matter is likewise distinguishable because PBLA does not and cannot allege that ULICO was a party to the negotiations between PBLA and the North Carolina Department of Insurance.  Indeed, in opposing the NC Complaint, PBLA submitted a witness statement from one of its representatives which expressly declared that for the MOU to have any effect upon ULICO, ULICO's consent would be needed:

> There are loans outstanding to lenders commonly referred to as ULICO, Vista Re, Northstar, as well as other insurance company lenders whose rights would be impacted significantly by the MOU.  The parties knew this was an issued that had to be worked through at the signing of the MOU.  Noble Consulting's [the Rehabilitator's consultant] view was that the necessary consents from the lenders would be obtained before the closing of the MOU.  Dinius [the Rehabilitator's consultant] has advised that the other lenders, with maybe the exception of ULICO (whose position is not yet clear to me) have indicated they are generally supportive of the MOU.  But to date, these consents have not been obtained."[16]

For these reasons, the private agreement between Bermuda-based PBLA and regulators in North Carolina cannot be declared to nullify an arbitration award upholding Puerto-Rico based ULICO's contractual rights.

---

[15] *See Telenor*, 524 F. Supp. 2d at 348.
[16] Ex. O, Meghji Affidavit, ¶ 6(a).

**D.      PBLA Has Not Met its Burden of Proving That the Consent Order Freezes PBLA's Assets.**

Even if PBLA could overcome the procedural and substantive hurdles set forth above, PBLA has not met its burden of proving that the Consent Order forbids PBLA from honoring its obligations to ULICO under the Reinsurance Agreement.  The NC Complaint makes plain that PBLA is a Bermuda-domiciled insurer which is not subject to North Carolina's rehabilitation order.  Ex. M, ¶ 116, at 20.  The Consent Order does not expressly prevent PBLA from complying with its contractual obligations to ULICO, but instead expressly exempts from the restraining order PBLA's payment of "expenses of ordinary business operations."  *See* ECF No. 41-1 at 5.  That the dollar amounts of PBLA's obligations are large is reflective of the substantial obligations PBLA owes to ULICO, and not that these expenses are not "ordinary business."

There is substantial evidence in the public record that Mr. Lindberg (who, along with PBLA, is one of the NC Defendants) does not view the Consent Order as freezing his assets. After the FBI's seized approximately $1.5 million from Mr. Lindberg's bank accounts, he did not argue to the criminal court that the seizure violated the Consent Order, but instead, in March 2020, waived his statutory right to have a jury decide the issue of forfeiture of those funds.[17] After a jury found him guilty, the U.S. moved for a preliminary order of forfeiture.  *Id.*  Recently, and with much fanfare, Mr. Lindberg made a $1 million charitable donation to the ACLU.[18]  If he, as a NC Defendant subject to the TRO and Consent Order, had his assets frozen, then obviously such a donation would be impossible (as would, of course, Mr. Lindberg's maintenance of a yacht, two private jets, and several luxurious homes).  For all these reasons, the Consent Order cannot be construed to restrict PBLA's assets (or those of Mr. Lindberg who, as a

---

[17] *See* Mot. Prelim. Order Forfeiture, *United States v. Lindberg, et al.*, No. 5:19-CR-00022-MOC-DSC, ECF No. 201 at 3.

[18] *Lindberg makes $1 million pledge to ACLU*, North State Journal (June 18, 2020), https://nsjonline.com/article/2020/06/lindberg-makes-1-million-pledge-to-aclu/.

condition of entering into the Reinsurance Agreement issued an ironclad guaranty (ECF No. 16-1 at 93 of 117) to ULICO that PBLA's debts would be paid).

## II.     The Panel is Not Guilty of Misconduct and Did Not Deny PBLA Due Process.

PBLA argues that the Award should be vacated under FAA § 10(a)(3) because the Panel "failed to afford PBLA the time needed to obtain current expert valuations" to prove that the assets in the Trust Account were safe, valuable, and liquid.[19]  PBLA argued to the Panel that extensive document and expert discovery should be conducted into the nature and amount of the assets in the Trust Account before any hearing on ULICO's emergency motion.[20]  The Panel did not agree, and it decided to hear the motion on the schedule proposed by ULICO to both the Court and to the Panel, and to allow the parties the opportunity to conduct discovery thereafter.[21]

Moreover, the evidence that PBLA contends it would have provided was not central to the thrust of ULICO's argument (or the Panel's Award), which was that the governing Puerto Rico insurance regulation prohibits more than 5% of the assets in a reinsurance trust account from being related-party investments, but PBLA's own "Investment Reports" expressly declare that "Related Party" assets comprise over $524 million of the Trust Account.  ULICO submitted witness statements of its Chief Investments Officer, Raúl Ramírez,[22] who authenticated

---

[19] ECF No. 40 at 18.  PBLA's position in the arbitration that the trust assets "are sufficiently valuable, safe, and liquid" (ECF No. 41-8 at 17) and that the documents it submitted to the Panel are proof of that (*id.* at 16) directly contradicts its new argument to the Court that all of its assets are completely *illiquid* due to the Consent Order.

[20] Notably, PBLA undermined its own arguments for discovery by simultaneously arguing that ULICO has had all the information "since day one" because PBLA's own ordinary course business records have disclosed "the relationships of the investments" in the Trust Account and provided "full visibility" and "transparency" as to "their nature."  Ex. C. at 29:5-18, 31:22-32:2.

[21] ECF No. 36-1 ("This Award is preliminary to resolution of the remaining disputes between the parties and the Panel expressly reserves jurisdiction to hear those remaining disputes.  The Panel directs the parties to meet and confer and propose to the Panel a pleading, discovery and hearing this, stating the time they think is needed for a full hearing on the merits.").

[22] Ex. F, Ramírez Witness Statement ¶¶ 29-30.

documents <u>created by PBLA itself</u> which expressly identified the vast majority of the assets in

the Trust Account as "Related Party" assets:

| Security Type | Related Party | Description |
|---|---|---|
| Term Loan | Yes | CHRYSANTHEMUM TWO LLC |
| Term Loan | Yes | CLTC Jr. |
| Term Loan | Yes | CMC Holdings |
| Term Loan | Yes | DAISY SEVEN LLC |
| Term Loan | Yes | Drummond |
| Term Loan | Yes | Epping, LLC |
| Term Loan | Yes | Flowery Branch, LLC |

*See* Ex. K at 4 (PBLA's December 31, 2019 Investment Report) (red circle added).

Given PBLA's authenticated admissions, there was no genuine issue of material fact

regarding the "Related Party" nature of the assets, and no "expert valuation" would change the

result. Nor did PBLA contradict ULICO's evidence that ULICO had been requesting PBLA to

address these matters for more than 18 months and that, after all this delay, the AM Best rating

agency and the Puerto Rico Commissioner of Insurance had made remediation of these matters

urgent for ULICO. Exs. I, J. Whatever opinions PBLA's "valuation experts" might have

offered, the undisputed facts are that an independent rating agency and the regulator with

jurisdiction over ULICO believe differently – a fact that PBLA has known for over a year.

The process followed by the arbitrators was consistent with the AAA Rules and the terms

of the Reinsurance Agreement.[23] The thorough and evidence-focused process that resulted in the

Award is not at all like the summary process which the Court rejected in *Home Indemnity Co. v.*

*Affiliated Food Distributors, Inc.*, No. 96 Civ. 9707(RO), 1997 WL 773712 (S.D.N.Y. Dec. 12,

---

[23] *See Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003)
("Where an arbitration clause is broad, as here, arbitrators have the discretion to order remedies
they determine appropriate, so long as they do not exceed the power granted to them by the
contract itself. It is not the role of the courts to undermine the comprehensive grant of authority
to arbitrators by prohibiting an arbitral security award that ensures a meaningful final award.")
(internal citations omitted).

16

1997).  The arbitrators in *Home Indemnity* (upon which PBLA relies) "refused even a threshold review of the underlying dispute," and awarded pre-hearing security "on the bare assertions of the parties, without even a glance at the underlying dispute or its possible merits."  *Id.* at *5.  The Court held that the arbitrators' security order "constituted fundamental unfairness under [FAA] § 10(a)(3)" and "clearly prejudiced" the respondent by barring it from discovery for the lifetime of the case, effectively precluding it from the ability to defend itself.  *Id.* at *4.  By contrast, in this matter: (1) ULICO's proposed  briefing and hearing schedule was discussed both in Court and by the arbitrators; (2) PBLA agreed to the hearing date and fully participated in briefing, including submitting extensive evidence, and oral argument before the Panel; (3) ULICO submitted sworn witness statements backed by documents prepared by PBLA itself in the ordinary course evidencing PBLA's admission that the Trust Accounts contained over $524 million in "Related Party" assets; (4) ULICO provided evidence of governing Puerto Rico insurance laws and regulations backed by qualified and admitted Puerto Rico attorneys; and (5) ULICO submitted undeniable evidence that independent rating agencies and regulators had declared the matter urgent.[24]  As the Panel expressly found (ECF No. 36-1 at 4-5), PBLA has been evading this issue for 18 months to the detriment of ULICO, and no further delays could be countenanced.[25]  On these facts, it is clear that any objections by PBLA to the schedule came too late to matter and reflected a desire to introduce evidence not relevant to the issue before the Panel.  The AAA

---

[24] *On Time Staffing, LLC v. Nat'l Union Fire Ins. Co.*, 784 F. Supp. 2d 450, 455-56 (S.D.N.Y. 2011) (confirming pre-hearing security award issued on "ample record" consisting of witness affidavits and "unrebutted documentary evidence," where party "had ample opportunity to oppose the motion for pre-hearing security, and did, in fact, vigorously oppose it").

[25] *See Banco de Seguros*, 344 F.3d at 259 (rejecting plaintiff's claim that arbitrators committed misconduct under FAA in issuing pre-hearing security award because plaintiff did not have "an opportunity to engage in discovery and to present [it's] evidence at a hearing").

Rules and the arbitration clause more than supported the Panel's conduct of the arbitration. *See, e.g.*, AAA R-32(b), R-37; ECF No. 16-1, §10.1.

### III.    The Award Was Not Issued in Manifest Disregard of the Law.

PBLA argues that the Award is in manifest disregard of the law because it granted the equivalent of injunctive relief, despite ULICO seeking only money damages.[26]  PBLA's argument is misguided on several grounds.  First, the AAA Rules expressly authorize the Panel to issue preliminary relief as they deem necessary.[27]  Second, ULICO's claim was not in the nature of injunctive relief, but to enforce on an emergency basis its contract right that PBLA promptly "take such steps as may be required" to ensure that ULICO is able to take full credit on its financial statements for PBLA's reinsurance.  ECF No. 16-1, ¶ 4.1(a).  Third, as ULICO established, and PBLA did not rebut, the rating agency and regulatory pressures upon ULICO create the very real threat that the failure to immediately cure concerns about the Trust Accounts will result in further downgrades, or worse.  Money damages at a later date in the future is no remedy if a regulator places ULICO into court-ordered rehabilitation or insolvency proceedings (as has happened to some of PBLA's affiliates).  Indeed, the arbitrators found that, absent the relief ordered by the Award, PBLA's actions would "cause irreparable harm to ULICO."  ECF

---

[26] PBLA mistakenly points to the "immediate and irreparable loss or damage" standard for obtaining "Emergency Measures of Protection" under AAA Rule 38, which applies only in situations where emergency relief is sought prior to the constitution of an arbitration panel from an emergency arbitrator appointed by the AAA only for that specific function.  ULICO's motion was made to the duly constituted Panel under AAA Rule 37, which contains no such "immediate and irreparable loss or damage" requirement.

[27] *See* AAA R-37(a)-(b) ("The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relieve and measures for the protection or conservation of property . . . .  Such interim measures may take the form of an interim award . . . .").

No. 36-1 at 6.  That PBLA disagrees with the Panel's finding does not constitute manifest disregard of the law and cannot be the basis to vacate an arbitration award.[28]

Also unmeritorious is PBLA's argument that the Award should be vacated because it did not give PBLA the right to assert offsets, or because it granted ULICO a windfall.[29]  PBLA's arguments regarding the value of certain assets in the Trust Account were rejected by the Panel as unproven.  *See* ECF No. 36-1 at 5.  As respects the issue of whether ULICO would receive a "windfall" upon PBLA's deposit of $524 million in cash into a segregated account, the arbitrators questioned ULICO concerning this issue and ULICO confirmed that, upon receipt of cash into the Trust Accounts, ULICO would return to PBLA an equal dollar amount of non-conforming Trust Account assets.  ECF No. 41-6 at 86:17-87:20.  In the event PBLA will honor the Award (and PBLA has said it will not), then the process for returning the Related Party assets in the Trust Accounts could be easily resolved by the parties or before the Panel.

## CONCLUSION

The Award does not, as PBLA argues, "require PBLA to do an illegal act," but instead compels PBLA to honor its contractual obligations to ULICO under the Reinsurance Agreement and under the requirements of Puerto Rico's insurance laws and regulations.  There is no public policy which forbids an arbitrator from enforcing the legal rights of one party to a contract

---

[28] *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) ("A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law. On the contrary, the award 'should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached.'").

[29] PBLA's argument to the Court about "offsets" is not the same argument it made in the arbitration.  PBLA argued to the Panel that it was entitled to an "offset" for its alleged loss from having to write off certain "Agera-related investments" which had been in the Trust Account when PBLA first entered into the Reinsurance Agreement with ULICO, but which are not currently in the Trust Account.  *See* ECF No. 41-16 at 65-67; *see also* Ex. G, ¶¶ 1-9.  Now, however, PBLA's "offset" argument relates not to the Agera investments, but to the assets *currently* in the Trust Account.  *See, e.g.*, ECF No. 40 at 21.  This argument should be rejected due to PBLA's failure to raise it timely before the Panel.

against the other party to that contract if the contract itself is not illegal.  Moreover, it would be unreasonable to read the Consent Order to mean that Bermuda-domiciled PBLA could enter into a binding agreement with the North Carolina Rehabilitator that would have the effect of releasing PBLA from its contractual obligations to ULICO.  Taken to its logical extreme, such an argument would mean that Bermuda-based PBLA and the North Carolina Rehabilitator have effectively declared PBLA's Reinsurance Agreement with ULICO to be null and void.  Such a conclusion cannot be consistent with public policy.

For the reasons set forth above, there is no basis to vacate the Panel's June 2, 2020 Award under either the New York Convention or the FAA.  Therefore, ULICO respectfully requests that the Court issue an Order pursuant to 9 U.S.C. §§ 9 and 207 confirming the Award, directing that judgment be entered thereon, and granting such other relief as the Court may deem just and proper.

Dated:   New York, New York
         July 9, 2020

                                    Respectfully submitted,

                                    CLYDE & CO US LLP

                                    By:_____
                                        Michael A. Knoerzer
                                        Jeffrey C. Fegan
                                        Kyley Knoerzer
                                    The Chrysler Building
                                    405 Lexington Avenue
                                    New York, New York 10174
                                    T: (212) 710-3900

                                    *Attorneys for Universal Life*
                                    *Insurance Company*